# JULY TERM, 1882.

### PRESENT:

HON. ALBERT H. HORTON, CHIEF JUSTICE.
HON. DANIEL M. VALENTINE, } ASSOCIATE JUSTICES.
HON. DAVID J. BREWER,

*In the Matter of the Petition of* FRANKLIN VANDERBERG,
*for a Writ of Habeas Corpus.*

1. ENROLLED STATUTE, *as Evidence.* The enrolled statute is very strong presumptive evidence of the regularity of the passage of the act of the legislative power of a state; and it is conclusive evidence of such regularity and validity, unless the journals of the legislature show clearly, conclusively, and beyond all doubt, that the act was not passed regularly and legally. (*The State v. Francis,* 26 Kas. 724.)

2. ENROLLED STATUTE, *When Conclusive Evidence of Passage and Validity of Act.* Where an act providing for the creation of a new judicial district in the state is challenged upon the ground that the journal of the house fails to show that two-thirds of the members of the house concurred in its passage, and from the confused and uncertain condition in which the journal appears, owing evidently to the haste in which it was kept, and the confusion attending the call of the roll and the changes of votes of the members, an examination thereof does not establish clearly, conclusively, and beyond all doubt that the act was not regularly and legally passed, the enrolled statute embodying the act in controversy will be deemed conclusive evidence of the regularity of the passage of the act, and also of its validity. And especially will the enrolled statute be considered conclusive, under such circumstances, where the act has been recognized as legally passed by both houses of the legislature; has been approved by the governor in the form it now appears enrolled; has been published under the authority of the secretary of state; has been recognized by the legislature as a valid act by the appropriation of money for the salary of the judge of the judicial district created thereby; has been acted upon by the chief executive of the state in the appointment and commission of a judge for the district; has been recognized by the people of the counties composing the district in the election of a judge thereof; and has further been recognized upon several occasions as a

*In re* Vanderberg, *Petitioner, &c.*

valid act by the supreme court, in the examination and affirmation of judgments rendered in actions heard and tried in the judicial district created by the act.

3. CH. 100, LAWS OF 1881, *Regularly Passed.* Chapter 100, Laws of 1881, entitled "An act to create the seventeenth judicial district, to provide a judge therefor, and for holding terms of court therein," approved March 5, 1881, was regularly passed by the house of representatives, and two-thirds of the members of the house concurred therein; and such chapter must be regarded as a legislative act enforcible by the courts of the state.

4. ———— Where it clearly appears from all the sources of interpretation that a provision of a statute has been inserted through inadvertence, it will be disregarded.

### *Original Proceedings in Habeas Corpus.*

PETITION filed in this court on June 8, 1882, on behalf of *Franklin Vanderberg,* for writ of *habeas corpus.* The petition alleges:

1. That the said Franklin Vanderberg is illegally restrained of his liberty by one Henry Hopkins, warden of the penitentiary of the state of Kansas, at the penitentiary of said state, at Lansing, Kansas.

2. The cause and pretense of his restraint, according to the best knowledge and belief of the said J. G. Mohler, is by virtue of a certain pretended order of commitment, pretended to have been issued by the district court of Ellis county, Kansas, on a certain pretended judgment pretended to have been rendered by said court on the 29th day of April, 1882, by which said pretended judgment the said Franklin Vanderberg was adjudged to be imprisoned in the penitentiary of said state at hard labor for the period of five years.

3. Said restraint is illegal, in this, that the said Franklin Vanderberg was arrested and brought before a tribunal pretending to be the district court of Ellis county, Kansas, on the 24th day of April, 1882, which said tribunal then and there convened was presided over by one W. H. Pratt, who then and there pretended and claimed to be the judge of the seventeenth judicial district of said state, and *ex officio* judge of the district court of said Ellis county, Kansas, and before which said tribunal the said defendant Franklin Vanderberg was held to answer the charge of burglary in the county of Ellis, and tried and afterward convicted of the offense of

burglary in the second degree, and thereafter, on the 29th day of April, 1882, was sentenced by said pretended tribunal and by said pretended judge thereof to confinement and hard labor for the term of five years in the penitentiary of the state of Kansas, and to pay the cost of the prosecution, taxed at —.

A copy of said pretended judgment is hereto annexed, marked "Exhibit A," and made a part of this petition. To all of which pretended proceedings, orders and judgment of said pretended court and said pretended judge thereof, the defendant then and there duly objected, and for the following reasons, and for which said reasons he now alleges that all of said proceedings, orders and judgment are illegal and void:

*First.* That there was no jurisdiction in the said pretended court and said pretended judge to hear and determine the said cause.

*Second.* That there was no power or authority in the judge to commit the said defendant to the penitentiary of the state of Kansas, or any place whatever.

*Third.* That the district court of Ellis county is and was at the time of said judgment, sentence, and all other proceedings had in this case, a part of the fourteenth judicial district of the state of Kansas.

*Fourth.* That the pretended term of the district court of Ellis county, Kansas, was not begun at any time provided for by law, was not an adjourned term of any regular term, was not a special term of said court in this, to wit: that no notice of the convening thereof had been given as required by law, or notice of any kind had been given by the judge.

*Fifth.* That the regular term of the district court of Lincoln county, Kansas, was begun on said 24th day of April, 1882, and continued to be holden until the said 29th day of April, 1882, each day inclusive; and that said Lincoln and Ellis counties were and are in the same judicial district, to wit, the fourteenth judicial district of the state of Kansas.

*Sixth.* That all of said proceedings, orders, judgment and sentence were pretended to be made by virtue of an act of the legislature of the state of Kansas pretended to be passed at the session thereof in 1881, being chapter 100 of the session laws of 1881, being an act entitled "An act to create the seventeenth judicial district, to provide a judge therefor, and for holding terms of court therein." Which said pretended act is null and void in this, to wit: that said act on its final passage

by the house of representatives did not receive the two-thirds votes of the members of the house of representatives which by the constitution of the state of Kansas is required.

The usual prayer for the issuance of the writ was also annexed thereto. Upon such petition a writ of *habeas corpus* was allowed, and issued by Mr. Justice VALENTINE, on June 8, 1882, and was duly served upon Henry Hopkins, warden of the penitentiary of the state. Said warden made the following return:

"The undersigned, Henry Hopkins, warden of the penitentiary of the state of Kansas, for answer and return to the writ of *habeas corpus* hereto annexed, states:

"That, before the coming of said writ to him, and on the —— day of May, 1882, the said Franklin Vanderberg was placed in his custody in the said penitentiary, as warden thereof, by virtue of the judgment rendered and warrant of commitment issued by the district court of Ellis county, state of Kansas, a copy of which judgment and warrant of commitment is hereto annexed and made a part of this return.

"That he, the said warden, has since the last said date detained and now holds the said Franklin Vanderberg in his custody in the Kansas state penitentiary, by virtue of the said judgment and warrant of commitment; and that, in obedience to said writ of *habeas corpus*, the body of said Franklin Vanderberg is now produced before the supreme court of the state of Kansas, to be dealt with according to law, as by said writ commanded."

(Here follows a copy of the judgment and warrant of commitment.)

To the answer and return of Henry Hopkins, the petitioner filed the following reply:

"And now comes the said Franklin Vanderberg, the petitioner, plaintiff herein, and for his reply to the answer of the said Henry Hopkins in this cause filed, denies every allegation therein contained, except what is herein expressly admitted.

"And for a second and further reply to the said answer, this petitioner, plaintiff, avers that there is not any record of the said supposed judgment and conviction, in said answer mentioned, in the said district court of Ellis county, in said state of Kansas, as therein alleged; and this he prays may be inquired of by the court here.

"And for a third and further reply to the said answer, this petitioner, plaintiff, avers that on the 24th day of April, 1882, one W. H. Pratt, at said Ellis county, in said state of Kansas, claiming to be the judge of the district court of said Ellis county, pretended to open and hold an April term of the said district court, and to try and decide causes, render judgments, and transact all the business of the said district court, and did on said date aforesaid, cause the plaintiff petitioner to be brought before him as such pretended court, upon a charge of burglary, and did thereafter make an order and judgment as he pretended, by virtue of which this petitioner, plaintiff, was and now is confined in the penitentiary of said state. And the said W. H. Pratt claimed the right and power so to do by virtue of being a judge of the seventeenth judicial district of the said state of Kansas.

"And this petitioner, plaintiff, avers that at the time aforesaid there was not, never was, and is not now, any seventeenth judicial district of the state of Kansas; that the said Ellis county then was, and still is, a part of the fourteenth judicial district of the state of Kansas aforesaid; that the pretended term of court, so held as aforesaid, was not an adjourned term of the district court of said Ellis county, in said state, and prior to said date no notice of the holding of any special term of said district court, at that or any other time, had ever been given as required by law; that at said time the said W. H. Pratt was not the regular judge of the said fourteenth judicial district, nor had he been selected, chosen or elected judge *pro tempore* of said district court, as provided by law; that the regular term of the district court of Lincoln county, in said fourteenth judicial district, was begun and held as by law required on said day above mentioned, by J. H. Prescott, the regular judge of said county and district.

"By reason whereof, all the proceedings, acts and things done and pretended to be done at the said supposed April term, in restraining and depriving this plaintiff of his liberty, were and are wholly illegal, unauthorized and void; and these are the same acts, judgments, orders and proceedings as are mentioned and alleged in the said answer. And this he is ready to make appear."

A copy of the original tally-list of the vote on the final passage of house bill No. 119, is as follows:

"Substitute for house bill No. 119, an act creating the seventeenth judicial district, to provide a judge therefor, and for holding terms of court therein, was read a third time.

*In re* Vanderberg, *Petitioner, &c.*

(Substitute House Bill No. 119.)
HOUSE ROLL, 1881.

| NAMES. | YEAS. | NAYS. | NAMES. | YEAS. | NAYS. |
|---|---|---|---|---|---|
| Ady | 77 | ... | Hall | 1 | ... |
| Addy | 1 | ... | Hargrave | 85 | ... |
| Allen | 66 | ... | Harris | 2 | ... |
| Anderson (Lincoln) | ... | ... | Hazen | 89 | ... |
| Anderson (Shawnee) | 71 | ... | Heizer | 3 | ... |
| Babcock | ... | ... | Heron | ... | ... |
| Barker | 2 | ... | Hill | 4 | ... |
| Bass | 3 | ... | Hoag | 5 | ... |
| Bæeson | 4 | ... | Hogan | 87 | ... |
| Bennyworth | 94 | ... | Houston | 6 | ... |
| Benson | 67 | ... | Hubbard | 86 | ... |
| Blain | 72 | ... | Hutchison | 7 | ... |
| Bolinger | ... | ... | Inglefield | ... | ... |
| Brewster | 5 | ... | Jones | 8 | ... |
| Brown | 6 | ... | Keeney | 29 | ... |
| Browning | 82 | ... | Kelley | 30 | ... |
| Calvin | 84 | ... | Kirkpatrick | 1 | ... |
| Cannon | 83 | ... | Knappenberger | ... | ... |
| Carpenter | ... | 1 | Lawhead | 88 | ... |
| Charlesworth | 7 | ... | Lawson | 2 | ... |
| Clapp | 81 | ... | Lebold | ... | ... |
| Clogston | 69 | ... | Legate | ... | 8 |
| Cloyes | ... | ... | Leigh | 3 | ... |
| Cochran (Bourbon) | ... | 2 | Lemmon | 4 | ... |
| Cochran (Crawford) | 73 | 3 | Leslie | 5 | ... |
| Cool | 93 | ... | Marvin | ... | ... |
| Cory | 8 | ... | Mayhew | 6 | ... |
| Cox | 91 | ... | McCrumb | 7 | ... |
| Cracraft | ... | ... | McMaster | 8 | ... |
| Crouch | ... | ... | Miles | 9 | ... |
| Crump | 79 | 4 | Millington | 40 | ... |
| Davis (Doniphan) | ... | ... | Mitchell | 90 | ... |
| Davis (Pratt) | 9 | ... | Montgomery | 1 | ... |
| Divilbess | 92 | ... | Moody | ... | ... |
| Dodd | ... | ... | Moore | ... | 7 |
| Dofflemyre | 10 | ... | Morgan | 2 | ... |
| Doolittle | 1 | ... | Munsell | ... | ... |
| Drought | ... | ... | Newby | 3 | ... |
| Dunwoody | 2 | ... | Nicholson | ... | ... |
| Eckles | 3 | ... | Norris | ... | 8 |
| Fleck | ... | ... | Orner | 4 | ... |
| Foucht | ... | ... | Osbon (Washington) | ... | ... |
| Francis | 4 | ... | Osborn (Greenwood) | 5 | ... |
| Games | 5 | ... | Peake | ... | ... |
| Gates | 6 | ... | Peterson | 74 | 9 |
| Geraughty | 70 | ... | Pierce | 78 | ... |
| Giesy | ... | 5 | Points | ... | 10 |
| Glick | 7 | ... | Post | 6 | ... |
| Gowan | 8 | ... | Potter | 7 | ... |
| Graves | 75 | ... | Puderbaugh | ... | 9 |
| Green (George S.) | 9 | ... | Rastall | 8 | ... |
| Green (N.) | 20 | ... | Rice | ... | ... |
| Haberlein | 68 | ... | Robbins | 76 | ... |
| Hagaman | ... | 6 | Rood | ... | ... |

HOUSE ROLL—Concluded.

| NAMES. | YEAS. | NAYS. | NAMES. | YEAS. | NAYS. |
|---|---|---|---|---|---|
| Rossman | ... | ... | Sutton | ... | ... |
| Russell | 9 | ... | Swart | 80 | ... |
| Schnebly | 50 | ... | Taylor | 8 | ... |
| Schott | 1 | 10 | Tousley | 9 | ... |
| Sears | 2 | ... | Turner | 60 | ... |
| Seaton | 3 | ... | Vannordstrand | 1 | ... |
| Sexton | ... | ... | Walton | ... | ... |
| Snoddy | ... | ... | Waring | 2 | ... |
| Snyder | ... | ... | Waters | 3 | ... |
| Stanley | 4 | ... | Watkins | 4 | ... |
| Steele | 5 | ... | Webbert | ... | ... |
| Stevenson | ... | ... | Wilson | ... | ... |
| Stine | 6 | ... | Wright | 5 | ... |
| Stone | 7 | ... | Mr. Speaker Johnson | ... | ... |
| Straight | ... | ... | | | |

Yeas, 65       Nays, 10   9   8
   94   93       10   9   8   7

"A constitutional majority having voted in favor of the passage of the bill, the bill passed, and the title being again read, was agreed to.

"Ordered, that the chief clerk inform the senate thereof."

*J. G. Mohler*, and *C. A. Hiller*, for petitioner, submitted a supplemental argument upon the original manuscript of the house journal with regard to the entries of the yeas and nays taken on the final passage of substitute for bill No. 119, in which they presented a critical review of the enrolled statute, and contended that the presumptions attaching to the acts of a public officer are all in favor of the correctness of the printed journal, which gives but ninety-three yeas, including the illegal votes of Davis (of Pratt), Francis, Gates, Hargrave, Keeney, Montgomery, Newby, Stone, Tousley, and Turner—ten members.

The rule in the case of *The State v. Francis*, as to the weight of the enrolled statute and the journal, is correct as a general statement of a principle to be applied to the acts of a legislature, *where there is a legislature*. But where it is known that a body of men claiming to be a legislature includes as members and participants men who are not members and cannot make a law, no enrolled statute is of any force without a record of the proceedings. If three hundred men had participated in the proceedings, there would hardly

be any question as to the weight of an enrolled statute alone in this state. Is not the rule the same with any less number?

Again, the language of the court relied upon by the attorney general is: "If there is any room to doubt as to what the journals show; if they are *merely silent* or ambiguous, or if it is possible to explain them upon the hypothesis that the enrolled statute is correct and valid; then," etc. This cannot mean that the journal could be entirely silent, for it would then be no journal; nor could it be merely silent about the organization, else how could it be known that the body was the legislature provided by the constitution? A record imparts absolute verity, but it must first appear to be a record. So an enrolled statute derives vitality from the journal—not as to its minor details, but from its essentials. We conceive the true rule to be, that where the journal shows the participation in the business of the session of illegal members, none of its acts are laws until shown to have been enacted by the law-making power.

If we were trying to uphold the law, and the figures 93 and 94 appeared on the journal with 93 erased, it would be not only possible but probable to explain this in the manner above stated, upon the hypothesis that the enrolled statute is valid. What reason or justice is there in creating a doubt when the converse of this proposition is to be decided? We think the rule given by Cooley, in his work on Constitutional Limitations, (p. 140,) is the only safe one. "It must appear on the face of the journal that the bill passed by a constitutional majority," and this alone can furnish the "definite and conclusive evidence whether the bill has been passed by the requisite majority or not."

We fail to see any ground upon which the house journal can be held incorrect or ambiguous, unless it be as to whether the bill in question received 92 or 93 votes; but we do think that where the constitution provides that the yeas and nays shall be entered on the journal, and thereby determine the final passage of any measure, and no law provides for additions by the clerk, that the true construction would be in this case to decide that Dunwoody's vote should not be counted,

and that only 92 votes stand recorded in favor of the passage of the bill.

*W. A. Johnston*, attorney general, for The State:

The validity of a law creating a court cannot be questioned in a collateral proceeding. (20 Mo. 393; 9 Wis. 264; 5 Tex. Ct. App. 579.) There was a district court in Ellis county; and a judge appointed or elected by virtue of an unconstitutional law is at least a judge *de facto*, and so far as his judgments or orders affect third persons or the public, they are conclusive and binding. (36 Conn. 432; 38 id. 449; 3 Denio, 381; 3 Barb. 166; 21 Ohio St. 610.) The judge is not only a *de facto* judge, but is one *de jure*. The enrolled statute, where it conflicts with the journal, is paramount, and must prevail over the latter. It is the better evidence, and of a higher character than the journal. (30 Ind. 514; 32 N. J. 29; 10 Nev. 176; 13 Md. 413; 8 Tex. Ct. App. 176; 15 Kas. 211.) The original journal shows that there were 94 in figures for house bill 119; so also the docket clerk's journal shows. Two-thirds of the house means two-thirds of a quorum or working house, and not two-thirds of all the members. (*Vide* §§ 13, 14, 15 and 27, art. 2 of Const.; § 14, art. 3; § 2, art. 5; § 5, art. 11; § 1, art. 14; Cooley's Const. Lim. 141; 2 Mich. 287; 4 Mo. 303.) The legislature has by a subsequent act (ch. 19, Laws of 1881) recognized and ratified what may have been defective or irregular in the act creating the seventeenth judicial district. (12 Kas. 426; 7 Blatch. 406.) The governor and the treasurer of state have also recognized the judge of this district. The act providing when court should be held in the fourteenth judicial district was earlier than the act creating the seventeenth. Including Ellis county in the former act was evidently an inadvertence of the legislature. An absurd or inconsistent provision inserted in an act inadvertently, should be disregarded. (38 Cal. 572.)

*David Rathbone*, also for The State:

The investigation must be limited to the statute roll and the journal as recorded, and unless its unconstitutionality ap-

pears on the face of the law, or the journal shows on its face that it failed to receive a two-thirds vote of the members thereof as organized by itself, it must be held valid. We challenge the right of the court to go behind either to determine whether the house was then legally organized, and whether the members voting for the passage of the law were legally entitled to seats therein; for, whether legally organized or not, it was *de facto* the house of representatives of Kansas, and the determination of the right to seats therein of persons elected by the people of the organized counties of the state is exclusively within the constitutional jurisdiction of that body. (14 Ill. 299.) The supreme court has no appellate jurisdiction or supervisory control over the proceedings thereof; it cannot in a collateral proceeding of this character, or by appeal, determine the rights of members to seats therein. The granting of a power by the people to one coordinate department of the state government operates to exclude from the other departments the right to exercise the power thus granted. In addition to the repeated rulings of this court on this subject, we call attention to the following cases as sustaining the positions taken: 7 Wis. 630; 19 Ill. 329; 1 Ark. 570; 1 Dutch. (N. J.) 349 to 354; 32 Mo. 510; 29 Mich. 331; 8 R. I. 192; 58 Mo. 369; 39 id. 392. Neither the validity of a judgment nor the constitutionality of a law can be tried collaterally by *habeas corpus*. (Wharton's Cr. P. & P., 8th ed., § 996, and authorities cited.) That question must be tested, if at all, by means of a trial in the appropriate court. (47 Mo. 164–5; 51 Cal. 375; 1 Barb. 296; 4 Tex. Ct. App. 425; 39 Tex. 705.) The title of the trial judge cannot be inquired into collaterally. (3 Barb. 162; 1 Cranch, 137; 1 Kent's Com., pp. 447 to 450.)

The opinion of the court was delivered by

HORTON, C. J.: The question in this case is, whether the conviction and sentence of the petitioner, Franklin Vanderberg, in the district court of Ellis county at the April term for 1882, were absolutely void. It is alleged on the part of the petitioner that there is not, and never was, any seven-

teenth judicial district in this state; that Ellis county, at the date of the conviction and sentence, was, and continues to be, a part of the fourteenth judicial district of the state; that W. H. Pratt was not the regular judge of the fourteenth judicial district, nor the judge *pro tem.* of said district, nor the judge *de jure* or *de facto* of any court or district; that at the time he was holding court in Ellis county, the regular term of the district court of Lincoln county, one of the counties comprising the fourteenth judicial district, was being held as required by law, by J. H. Prescott, the elected judge of that county and district; that all the proceedings, acts and things done and pretended to be done at the April term of the court of Ellis county for 1882, toward restraining and depriving the petitioner of his liberty, were and are wholly illegal and unauthorized. The alleged grounds for this contention are two-fold:

First, that chapter 100, Laws of 1881, entitled "An act to create the seventeenth judicial court to provide a judge therefor, and for holding terms of court therein," cannot be regarded as a legislative act enforcible by the courts, because it is claimed on the part of the petitioner that the act on its final passage by the house of representatives did not receive the votes of two-thirds of the members thereof, as ordained by the constitution of the state to be necessary to increase the number of judicial districts. (Sec. 14, art. 3, State Const.)

Second, that chapter 98, Laws of 1881, providing for terms of court in the fourteenth judicial district, designates that court shall be held in the county of Ellis on the fourth Monday of March and the last Monday of September in each year, and is therefore in conflict with chapter 100, Laws of 1881, creating the seventeenth judicial district and naming Ellis county as a part thereof, and fixing the time for the holding of courts therein on the fourth Monday of April and the third Monday of October of each year.

If we accept the enrolled statute embodying the act now challenged by the petitioner as conclusive evidence of the regularity of the passage of the act and of its validity — as

in many of the states the courts decide must be done — we would not be at liberty to inquire into or dispute the enactment or contents of this statute. (13 Cent. L. J. 181.) If it were so held, it would be incumbent upon us to declare without other reason that the seventeenth judicial district had been legally created, and that at the time the sentence was passed upon the prisoner, W. H. Pratt was the judge thereof, both *de jure* and *de facto*. It is said, however, in the opinion of the *Division of Howard County,* 15 Kas. 194, that "we take judicial notice without proof of all the laws of our own state. All the courts of the state are required to do this, and in doing this we take judicial notice of what our books of published laws contain." In *The State v. Francis,* 26 Kas. 724, it is also stated that —

"In this state, where each house is required by the constitution to keep and publish a journal of its proceedings, we cannot wholly ignore such journals as evidence, and therefore, when there can be no room for doubt from the evidence furnished by such journals, that the statute was not passed by a constitutional majority of the members of either house, then the courts may declare that the supposed statute was not legally passed, and is invalid."

This language of the opinion is qualified, however, as follows:

"The enrolled statute is very strong presumptive evidence of the regularity of the passage of the act and of its validity, and it is conclusive evidence of such regularity and validity, unless the journals of the legislature show clearly, conclusively and beyond all doubt that the act was not passed regularly and legally. If there is any room to doubt as to what the journals of the legislature show; if they are merely silent or ambiguous; or, if it is possible to explain them upon the hypothesis that the enrolled statute is correct and valid, then it is the duty of the courts to hold that the enrolled statute is valid."

In view of these decisions of our court, we have examined with great care the original house journal of 1881, to ascertain if it establishes "clearly, conclusively, and beyond all doubt," that chapter 100 was not regularly and legally passed. The house of representatives of the state for 1881 consisted apparently of one hundred and thirty-seven persons. At

least, one hundred and thirty-seven persons attempted to take part in the proceedings of the house.   Under the decision of. *The State v. Francis*, supra, as the number of representatives can never exceed one hundred and twenty-five, some of these persons must have been there illegally, and under that decision the twelve persons from counties which were not provided for by law with numbers or districts, and who were the last members admitted to seats, were not entitled to seats; and any act passed only by the assistance of their votes must be held as not having passed the house of representatives, and as void.   From an examination of the house journal as published, ninety-three members voted yea and ten nay upon the passage of the act now challenged.   In the yeas were included the illegal votes of Davis, Francis, Gates, Hargrave, Keeney, Montgomery, Newby, Stone, Tousley, and Turner. Two-thirds of the constitutional members of the house would be eighty-four.   If the ten votes of the persons who were illegally admitted to the house were deducted from the total yeas, eighty-three only would remain, and therefore if the journal of the house as printed is conclusive, it could not be said that two-thirds of the constitutional members of the house concurred in the creation of the seventeenth judicial district, and if the printed journal of the house is a correct exemplification of the original journal, then, within the language of the opinion in *The State v. Francis*, supra, we would be bound to say that chapter 100, Laws of 1881, did not receive the votes of a constitutional two-thirds of the members of the house, and therefore that it did not pass the house as prescribed by the constitution.   But our examination of the original journal convinces us that the printed journal is not to be taken as conclusive against the validity of the enrolled statute embracing chapter 100.   Counsel for the petitioner claim that the original journal shows ninety-two votes only recorded in favor of the passage of the bill.   The clerk, in the printed journal, counts ninety-three votes recorded for the bill.   This difference is proof that the journal is doubtful.   The only way the yeas and nays were entered

upon the journal of the house upon the passage of the substitute for house bill No. 119, now known as chapter 100, Laws of 1881, was by a roll of the names of all the persons admitted as members of the house being attached to the journal, and the names of the persons voting upon the measure being numbered. At least, an attempt was made to enter numbers opposite their names. These numbers opposite the names of persons voting on the first call of the roll, increase in regular progression of tens. The last number of each series of affirmative tens closes with the number sixty, after which five more votes are numbered, running down through the roll, and the first total of sixty-five yeas is indorsed at the foot of the roll. The votes, from sixty-five to ninety-four, were apparently cast on the second call of the roll, or when the members appeared in the hall, as the numerals opposite the names of the affirmative voters from sixty-five to ninety-four are scattered irregularly through the roll. It is also apparent that some of the members changed their votes, and the face of the original journal shows different counts and many attempted corrections. At the bottom of the roll the number ninety-four appears, and this number also appears opposite the name of Bennyworth, the member from Pawnee county. It is very evident to us that ninety-four persons voted originally in favor of the passage of the act; that ninety-four votes were numbered and counted by the clerk, or his assistant, as voting in favor of the act, and that this number was announced to the house, and that the house understood that ninety-four votes had been recorded for the bill upon its final passage. This is corroborated not only by the figures ninety-four, at the bottom of the roll, and by the figures opposite the name of Bennyworth, but also by the journal kept by the docket clerk, which shows that ninety-four votes were cast in favor of the act. From sixty-five to ninety-four, inclusive, the numbers are regularly set opposite the names of members voting affirmatively, and the numerals ninety-four opposite the name of Bennyworth have never been changed or erased. They

stand to-day as a part of the journal of the house. To our mind the natural supposition is, that in the haste of calling the roll, and in the confusion incident to the checking the names of the members voting and the marking of numerals opposite thereto, the name of some person who had voted yea was marked nay, or some member, after the count, was improperly marked as having changed his vote from yea to nay. Had the numerals ninety-four, opposite the name of Bennyworth, been changed and corrected to some other number less than ninety-four, we might suppose that the figures ninety-three yeas and ten nays were the true votes given for and against the bill, but as against the enrolled bill, we have no more right to assume that the ninety-four opposite the name of Bennyworth was improperly recorded, than we have to assume that the keeper of the journal committed an error in marking the vote of Schott as changed from yea to nay. To ignore the numerals ninety-four, opposite the name of Bennyworth, requires us to question the integrity of the journal. If it be discredited as to one name, it falls before the strength of the enrolled bill. Viewing it from any standpoint, upon its face the journal is conflicting and ambiguous. If the act upon its passage received ninety-four votes, striking from the list all of the illegal votes pointed out, still two-thirds of the constitutional members of the house concurred in its passage. As the house is constituted of one hundred and twenty-five members, eighty-four votes were sufficient. In any event, from our personal inspection, we cannot say that the original journal of the house "shows clearly, conclusively, and beyond all doubt," that chapter 100 was not regularly and legally passed. In our opinion the enrolled statute embracing chapter 100 is too strong evidence of the regularity of the passage of that act and of its validity, to be overthrown and destroyed by the journal, as it now appears in its confused and unascertainable condition. The enrolled statute is not to be set aside upon mere guesses or surmises, nor upon a doubtful interpretation of a journal seemingly contradictory upon its face. Further, chapter 100 is now challenged before us for the first

17 — 28 KAS.

time. This statute has been recognized by both houses of the legislature; has been approved by the governor in the form as it now appears enrolled in the office of the secretary of state; has been published under the authority of the secretary of state as a valid statute; has been recognized by the legislature as an existing statute, by the act appropriating money for the salary of the judge of the seventeenth judicial district for the years 1881 and 1882; has been acted upon by the chief executive of the state, in the appointment and commission of a judge for the seventeenth judicial district; has been recognized by the people of the counties comprising that district, by the election of the presiding judge who passed the sentence upon the petitioner; and this court has upon several occasions examined and affirmed judgments in actions heard and tried by the judges of that district. Under all these circumstances we do not hesitate to say, that we would require the original journal of the house to establish, beyond all possible doubt, that the act was not concurred in by two-thirds of the constitutional members of the house, before we would be willing to disregard and treat it as naught, when it seems to be surrounded and supported by so many appearances of absolute validity.

One thing further as to the conflict between chapter 98 and chapter 100. Both acts were approved March 5, 1881. It is contended on the part of counsel of the petitioner, that chapter 98 is the last expression of the legislative will. Even if this were true, the insertion of Ellis county in chapter 98 was evidently an inadvertence. Chapter 100 created the seventeenth judicial district, and mentions Ellis county as comprising a part thereof. It further provides for the holding of two terms of court in the county for each year. Chapter 98 provides for the terms of the court in the fourteenth judicial district, another and a different district than that in which Ellis county had been located by chapter 100. If it clearly appears from all the sources of interpretation that a provision of a statute has been inserted through inadvertence, it will be disregarded. (*Pond v. Maddox*, 38 Cal. 572.

See also Potter's Dwarris on Stat. Construction, 183; *Shrews-bury v. Boylson*, 1 Pick. 105; *People v. King*, 28 Cal. 265; *Turnpike Co. v. McKean*, 6 Hill, 616; *Moody v. Stephenson*, 1 Minn. 401; [Gil. 289;] *Winona v. Whipple*, 24 Minn. 61; *Smith v. People*, 47 N. Y. 330.)

We must, therefore, upon this doctrine, disregard the provision relating to Ellis county in chapter 98. Of course, if chapter 100 were the last enactment of the legislature, it would be valid and binding in all of its terms, notwithstanding the provisions of chapter 98, even if none of the provisions thereof had been inserted by inadvertence.

Several other questions have been fully and elaborately presented upon the hearing of this case, but the conclusion obtained makes it unnecessary to consider them.

Nothing appearing before us ·upon the record or evidence presented, warranting any judgment annulling the conviction of the petitioner, he must be remanded into custody.

All the Justices concurring.