A. F. CHESNEY v. W. S. McCLINTOCK, *as Justice of the Peace of the City of Topeka.*

**No. 11,507.**   (58 Pac. 993.)

1. CONSTITUTIONAL LAW—*Presumptions from Enrolment and Approval.* The history of a bill introduced into the legislature, as disclosed by the journals of the two houses, raised a doubt whether it was amended in the house after its passage by the senate, and whether or not the senate had concurred in the amendments so made. *Held,* that the bill having been duly enrolled, and approved by the governor, its validity cannot be impeached except by evidence of the clearest and most undoubted character.

2. ———— *City Court of Topeka.* Chapter 129, Laws of 1899, being "An act creating a city court in the city of Topeka," etc., is constitutional and valid.

3. ———— *Case Followed.* The case of *In re Greer,* 58 Kan. 268, 48 Pac. 950, followed.

Original proceeding in mandamus.   Opinion filed November 11, 1899.   Writ denied.

*G. C. Clemens, E. E. Chesney,* and *C. A. Starbird,* for plaintiff.

*Rossington, Smith & Histed,* and *L. H. Greenwood,* for defendant.

The opinion of the court was delivered by

SMITH, J. : The petitioner prays for the issuance of a peremptory writ of mandamus to compel the defendant, W. S. McClintock, a justice of the peace of the city of Topeka, to assume jurisdiction of and to try an action brought before him on May 18, 1899, wherein the plaintiff in the action has sued on a money demand in an amount exceeding one dollar. The justice of the peace refused to entertain jurisdiction of the cause for the reason that, by section 2, chapter 129, Laws of 1899, justices of the peace in said city have

Chesney v, McClintock.

been deprived of jurisdiction in civil actions for the recovery of money where the amount claimed exceeds one dollar.  The purpose of the action is to obtain a decision on the constitutionality of said act of the legislature creating "the court of Topeka."

The first contention is that the act creating a city court in the city of Topeka township was not passed by both houses of the legislature.  A history of the bill taken from the legislative journals is as follows : January 11, 1899, senate bill No. 7, with the title, "An act to create two city courts in the city of Topeka township," was introduced in the senate and read the first time.  On January 12 it was read the second time and referred to the judiciary committee.  January 25 the committee on judiciary reported senate bill No. 7 back to the senate with the recommendation that it be passed. February 10 the committee of the whole reported, recommending that senate bill No. 7 be passed as amended.  February 13 senate bill No. 7 was read the third time and passed.  February 13 the committee on engrossed bills reported substitute for senate bill No 7 back to the senate as having been correctly engrossed.

1. Legislative journals as evidence.

From the house journals it appears that on February 13, 1899, senate bill No. 7 was messaged from the senate.  On the same day senate bill No. 7 was read for the first time.  February 14 substitute for senate bill No. 7 was read a second time and referred to the committee on judicial apportionment.  February 15, the said committee reported recommending that the bill No. 7 be referred to the judiciary committee, and the recommendation was adopted.  February 23 the committee reported, recommending that senate bill No. 7 be passed.  February 25 substitute for senate bill

No. 7 was read the third time and passed, with the title agreed to as follows: "An act creating a city court," etc.

The senate journal shows that on February 25, 1899, substitute for senate bill No. 7 was transmitted to the senate by the chief clerk of the house with a message that the house had passed the bill. February 28, 1899, the governor approved substitute for senate bill No. 7, as shown by his message. February 28, 1899, the committee on enrolled bills reported concerning senate bill No. 7, "An act creating a city court," etc., that the engrossed copy had been compared with the enrolled bill; that the same was correctly enrolled; that it had been properly signed by the president and secretary of the senate and the speaker and chief clerk of the house, and had been presented to the governor for his approval. Indorsed upon the back of the original senate bill No. 7 is the following: " Recommended that substitute bill be passed."

Bills are not engrossed in either house until they have been reported favorably and are ready for third reading. The journals, together with the original bills introduced in evidence, lead us to believe that the bill which in fact passed the senate on February 13 was the substitute for senate bill No. 7 and not senate bill No. 7. On the back of the original senate bill No. 7 is the indorsement of the judiciary committee that said bill be not passed, and also the indorsement that the substitute be passed. The journals show that the same bill was designated both as senate bill No. 7 and substitute for senate bill No. 7. This appears by the fact that on February 14 the journal recites that the substitute for senate bill No. 7 was read a second time and referred; yet the journal of the next

Chesney v. McClintock.

day shows that said committee reported on senate bill No. 7. Again, on February 28 it is noted in the senate journal that the governor had approved substitute for senate bill No. 7. However, the report of the committee on enrolled bills, made the same day, stated that senate bill No. 7, "An act creating a city court," etc., had been correctly enrolled, properly signed by the president and secretary of the senate and the speaker and chief clerk of the house, and had been presented to the governor for his approval.

The different titles appearing on the journals by which the bill was designated, reciting the different steps taken in the progress of the bill, from the senate in the first instance to its final approval by the governor, ought not to impeach the validity of the law. In *In re Taylor*, 60 Kan. 87, 92, 55 Pac. 340, Chief Justice Doster used this language:

"While the journals of the two houses may be examined for the purpose of ascertaining whether the legislative branch has expressed its will in accordance with constitutional requirements, yet a legislative measure which has taken upon itself all the forms and appearances of verity which are involved in its enrolment in the office of the secretary of state, its certification by the president of the senate and speaker of the house and its approval by the governor, may not be impeached by the legislative journals, except when the proof furnished by them is of the clearest, strongest and most undoubted character."

In the opinion quoted from, comment is made on the hurried manner in which the journals are often made by clerks having little aptitude for the work and slight sense of responsibility in its performance, and of the fact that the journals are largely made up after the close of the session from disconnected notes and memoranda. "These facts," it is said in the

7—61 KAN.

opinion, "justify courts in attaching less weight to
journals of legislative proceedings, as evidence of the
non-enactment of laws, than they would otherwise
possess."

If, as plaintiff claims, the bill which in fact passed
the senate on February 13 was senate bill No. 7, why
is it that the history of this bill, as shown by the in-
dorsements on it, abruptly ends on February 12,
which is the date upon which it was reported unfav-
orably by the committee; and why is it that the bill
has no further indorsed history showing that it was
engrossed, considered in the committee of the whole,
placed upon third reading and messaged to the house
under the signature of the secretary of the senate; and
why is it that its subsequent house history, under the
signature of the chief clerk of the house, does not ap-
pear indorsed thereon?   Indorsed on substitute for
senate bill No. 7 is a complete history, from the time
that the judiciary committee reported on it until its
final passage in both houses and transmission to the
governor.   It is shown that it was favorably acted
upon by the committee in the senate to which it was
referred; that it was duly engrossed; that it was con-
sidered in the committee of the whole, passed upon
third reading, and messaged to the house.   All of these
indorsements of its history are over the signature of
the secretary of the senate.   In the house, as shown
by the indorsed history of this bill, it was received,
was read the first and second times, was referred to
the committee of the whole, read a third time, and
passed.   All of this history appears over the signature
of the chief clerk of the house.   It further appears
from the indorsement on the engrossed bill that it was
in turn duly messaged to the senate, and, as the sen-
ate journal shows, this is in fact the bill which was

before the governor, was approved by him, and returned to the senate.

At most, the senate journal is merely silent on the question as to whether substitute for senate bill No. 7 did in fact pass. It is not a sufficient argument to say that because there is a record of the passage of one bill, therefore the other bill did not pass. "If there is any room to doubt as to what the journals of the legislature show, if they are merely silent or ambiguous, or if it is possible to explain them upon the hypothesis that the enrolled statute is correct and valid, then it is the duty of the courts to hold that the enrolled statute is valid." (*The State, ex rel., v. Francis, Treasurer*, 26 Kan. 724, 731.) "If the enrolled bill were perfect and formal in every particular, then the courts might say that the bill had passed and become a law, although there might be omissions from the journals." (*Comm'rs of Leavenworth Co. v. Higginbotham*, 17 Kan. 62, 78.)

The law is next attacked for the reason that it attempts to create township officers with tenures longer than one year, in violation of section 4, article 9, of the constitution. The infirmity of this argument lies in the fact that the law in question did not create a township office. It created a tribunal designated "The court of Topeka." This the legislature had authority to do, under section 1, article 3, of the constitution. It provided by law for a court inferior to the supreme court. Whatever name might have been given to it, it is a judicial tribunal, created within the limits of the city of Topeka, which it was within the discretion of the legislature to establish.

*2. Act not in violation of constitution.*

Finally it is urged, with much force and sincerity, that this court ought to reconsider its former opinion

3. Greer case
   followed.

in the case of *In re Greer*, 58 Kan. 268, 48 Pac. 950. In that case, which involved the constitutionality of an act of the legislature creating two city courts in Kansas City, and restricting the jurisdiction of justices of the peace to amounts not exceeding one dollar, the scope and meaning of section 17, article 2, of the constitution, were considered. The case of *Elevator Co. v. Stewart*, 50 Kan. 378, 383, 32 Pac. 33, is quoted from approvingly. In the latter case Mr. Justice Valentine said:

" The third contention of the plaintiff, that the new act is in contravention of section 17, article 2, of the constitution, we think is also untenable. Some good reasons may be urged in favor of the plaintiff's contention, and two decisions of this court seemingly to some extent favor it. (*Darling v. Rodgers*, 7 Kan. 592; *Robinson v. Perry*, 17 id. 248.) But some good reasons and many decisions of this court are against his contention."

The same question was considered in *Eichholtz v. Martin*, 53 Kan. 486, 488, 36 Pac. 1064. Mr. Justice Johnston, speaking for the court, said:

" The old question so often raised is again presented: Was it competent for the legislature to determine whether a general law could be made applicable, and whether a special law was necessary? If the question were a new one, the writer of this opinion would be inclined to the view that the courts should determine in each case whether this constitutional restriction had been violated or not; but the question has been put at rest by a long series of decisions holding that the decision of the question is exclusively for the legislature, and not for the courts."

So in *Rathbone v. Board of Comm'rs*, 27 C. C. A. 477, 480, 83 Fed. 125, 128, Thayer, J., in passing on this section of our constitution, said:

" In two cases (*Darling v. Rodgers*, 7 Kan. 592, and

*Robinson v. Perry*, 17 id. 248) a contrary view seems to have been expressed, but it is now well settled by a long line of adjudications in that state that it is competent for the legislature to enact special laws, or to engraft exceptions upon general laws, if, for any reason, it sees fit to take such action."

It is insisted that the act, so far as it relates to or affects the jurisdiction of justices of the peace, is a law "of a general nature," dealing with a general, not a local or special, subject. We do not think so. While it restricts the jurisdiction of justices of the peace, officers provided for by the constitution, it attempts to apply such restriction only to justices in the city of Topeka. In laws relating to the levy and assessment of county taxes, it may be said that the legislature does not deal with a local or special subject, for counties, like the offices of justices of the peace, exist all over the state, its whole area being divided into such political divisions. Yet, in *Elevator Co. v. Stewart*, supra, a special law relating to the levy of taxes for general county purposes, confined in its operation to Cowley and Wyandotte counties only, was held to be valid.

" The legislature may pass a special act where a general law cannot be made applicable, and this although the special act may to some extent affect the uniform operation throughout the state of other laws ; and generally, it is a question for the legislature to determine whether a general law can be made applicable or not." (*City of Wichita v. Burleigh*, 36 Kan. 34, 42, 12 Pac. 336.)

In adhering to the principles announced in the case of *In re Greer*, supra, we conclude by using the language of Chief Justice Horton, in *Stone v. Boone*, 24 Kan. 337, 341 :

" There seems to be running through the entire body of judicial decisions the doctrine that judges

ought not to disturb prior rulings of the same court, except for cogent reasons; as some express it, 'only where the decision is flatly absurd or unjust,' as the certainty of the rule is often more important than the reason of it."

A peremptory writ of mandamus is denied.