MISSOURI, KANSAS & TEXAS RAILWAY COMPANY v. WALTER L. SIMONS, *as Judge, etc., et al.*

No. 14,846  (88 Pac. 551.)

SYLLABUS BY THE COURT.

1. CONSTITUTIONAL LAW—*Evidence of the Legal Enactment of a Statute.* While courts may look to the journals of a legislature as well as to the evidence furnished by an enrolled bill to determine whether a challenged act received the required number of affirmative votes, such acts, when approved, certified and authenticated as the constitution requires, cannot be overthrown by reason of entries in a journal which are themselves contradictory and of doubtful import.

2. ———— *An Act Held to Have Received the Required Number of Votes.* The validity of chapter 199 of the Laws of 1905, creating a judicial district, was challenged because of an entry in the journal of the house of representatives tending to show that a constitutional majority of the members of that house did not vote for the act. A later entry was to the effect that a constitutional majority did vote for the act and that it passed. *Held,* not to be invalid.

Original proceeding in mandamus.  Opinion filed January 5, 1907.  Writ denied.

*John Madden, W. W. Brown,* and *J. G. Slonecker,* for plaintiff.

*Morris Cliggitt, C. T. Boaz, J. J. Campbell, B. S. Gaitskill,* and *William R. Smith,* for defendants.

The opinion of the court was delivered by

JOHNSTON, C. J.: The question involved in this proceeding is the validity of the act creating the thirty-eighth judicial district.  It purports to take Crawford

county from the sixth judicial district and to make that county the new district. (Laws 1905, ch. 199.) After the passage and publication of the bill the governor appointed the Honorable Arthur Fuller to be judge of the new district, and he has since acted in that capacity, disposing of a large volume of business and rendering judgments in a great many cases, both civil and criminal. The plaintiff, assuming that the act was invalid and that Crawford county was still a part of the sixth judicial district, brought this proceeding against the Honorable Walter L. Simons, as judge of that district, to compel him to take cognizance of its appeal from a judgment of a justice of the peace of Crawford county. Judge Simons took the position that the act of 1905 was valid, and that Crawford county was no longer a part of the sixth judicial district, and therefore declined to take jurisdiction of the appeal.

It is claimed that the statute in question has no legal existence because the legislature did not fully comply with the constitutional requirements in its passage. The particular defect pointed out is that according to the house journal the act did not receive a constitutional majority of the members of the house of representatives. The act was designated as "House Bill No. 979," and the entry in the journal, after giving the number and title of the bill, is that it "was read the third time, and the question being, Shall the bill pass? the roll was called, with the following result: Yeas 83, nays 2; absent or not voting, 40." Then follows the entry, "a constitutional majority having voted in favor of the passage of the bill, the bill passed, and the title, as above, was agreed to." Immediately following this is a list of eighty-three names purporting to be the affirmative vote on the bill; then follows a list of two names purporting to be the negative vote, and that is followed by a list of forty names of members reported to have been absent or not voting. (House Jour. 1905, pp. 935, 936.)

It is conceded that the act passed the senate by an unquestionable majority, was duly approved by the governor, and properly deposited with the secretary of state. The act on its face as it is enrolled and printed is in all respects regular, and it is authenticated as the constitution requires. It is signed by the presiding officer of each branch of the legislature, the approving signature of the governor is affixed, and it has been duly published in the statute-book as the act itself provides. Although the act has been so certified by the officers having charge of legislation, and bears all the marks of authenticity, it is contended that the recitals in the journal of the house overcome this evidence and show that the act never received the requisite number of votes and therefore never became a law.

The constitution provides that the legislature may "increase . . . the number of judicial districts whenever two-thirds of the members of each house shall concur" (Const., art. 3, § 14; Gen. Stat. 1901, § 161), and if we assume, as counsel on both sides do, that this means two-thirds of all members elected to each house, and that only eighty-three of the one hundred and twenty-five members of the house of representatives voted in favor of the bill, it is plain that it did not receive the requisite number of votes. We have, then, an enrolled bill duly certified and authenticated, an entry in the house journal that it received a constitutional majority and had been passed, and another entry in the journal that only eighty-three members voted for the measure, which is less than a constitutional majority.

Two theories obtain as to the method of determining whether what purports to be an act of the legislature was constitutionally enacted. One, designated as the common-law rule, is that an enrolled bill authenticated and promulgated by the legislature as having been duly enacted is conclusive evidence of the existence and contents of the act. The other is that when a

question arises as to whether an act was constitution-
ally passed courts may look beyond the enrolled bill
and examine the journals of the legislature in which
are preserved the record of its proceedings to deter-
mine the existence and validity of the enrolled bill.
There is a great diversity and some fluctuation of ju-
dicial opinion upon the question, but the rule that re-
sort may be had to the legislative journals was early
announced in Kansas and has been consistently fol-
lowed from the first. (*Division of Howard Co.*, 15
Kan. 194; *Comm'rs of Leavenworth Co. v. Higgin-
botham*, 17 Kan. 62; *Prohibitory-amendment Cases*, 24
Kan. 700; *The State, ex rel., v. Francis, Treas'r*, 26
Kan. 724; *In re Vanderberg, Petitioner, &c.*, 28 Kan.
243; *Weyand v. Stover, Treas.*, 35 Kan. 545, 11 Pac.
355; *Ayers v. Comm'rs of Trego Co.*, 37 Kan. 240, 15
Pac. 229; *The State, ex rel., v. Robertson*, 41 Kan. 200,
21 Pac. 382; *C. K. & N. Rly. Co. v. City of Manhattan*,
45 Kan. 419, 25 Pac. 879; *In re Gunn, Petitioner*, 50
Kan. 155, 32 Pac. 470, 948, 19 L. R. A. 519; *Homrig-
hausen v. Knoche*, 58 Kan. 646, 50 Pac. 879; *In re Tay-
lor*, 60 Kan. 87, 55 Pac. 340; *Chesney v. McClintock*,
61 Kan. 94, 58 Pac. 993; *The State v. Andrews*, 64
Kan. 474, 67 Pac. 870.)

We are asked to reopen and reconsider the question,
but we see no good reason to disturb a rule declared
shortly after the constitution was framed and from
which there has been no departure or deviation. It
is not deemed necessary to consider which rule affords
the greater safety to the public, nor to set forth the
positions now held by the several courts of the country.
It may safely be said, however, that the weight of au-
thority favors the theory that courts may look to the
journals of the legislature when the existence of an
authenticated act is challenged. In Kansas the en-
rolled bill is regarded as record evidence of the high-
est character, but not as conclusive evidence. The
constitution provides the manner in which a law shall

be authenticated, and when it bears these marks of authenticity it should not be lightly overthrown. The constitution, which provides how a bill shall be passed, approved and authenticated, also provides that each house of the legislature shall keep a journal of its proceedings while passing such bill, and hence these journals are constitutional evidence of the principal steps taken by the legislature during the progress of a bill from introduction to enrolment. The enrolled bills and journals together constitute the evidence of the acts passed by the legislature and are the only evidence to which courts may look to ascertain whether the legislature has observed the constitutional requirements in their enactment. The relative dignity and force of the two kinds of evidence have frequently been considered. The rule was tersely expressed by Mr. Justice Valentine in *The State, ex rel., v. Francis, Treas'r,* 26 Kan. 724, where he said:

"The enrolled statute is very strong presumptive evidence of the regularity of the passage of the act and of its validity, and that it is conclusive evidence of such regularity and validity, unless the journals of the legislature show, clearly, conclusively and beyond all doubt that the act was not passed regularly and legally. . . . If there is any room to doubt as to what the journals of the legislature show, if they are merely silent or ambiguous, or if it is possible to explain them upon the hypothesis that the enrolled statute is correct and valid, then it is the duty of the courts to hold that the enrolled statute is valid." (Page 731.)

In *Homrighausen v. Knoche,* 58 Kan. 646, 50 Pac. 879, the validity of an act was challenged upon the ground that a constitutional majority of the house did not vote in favor of the measure. Some of the entries in the journal indicated that a constitutional majority had voted for the bill, while others indicated the contrary, and it was held that the journal did not make that clear and conclusive showing of invalidity which would overthrow the evidence furnished by the en-

rolled bill. In the case of *In re Taylor,* 60 Kan. 87, 55 Pac. 340, the following language was used:

"While the journals of the two houses may be examined for the purpose of ascertaining whether the legislative branch has expressed its will in accordance with constitutional requirements, yet. a legislative measure which has taken upon itself all the forms and appearances of verity which are. involved in its enrolment in the office of the secretary of state, its certification by the president of the senate and speaker of the house and its approval by the governor, may not be impeached by the legislative journals except when the proof furnished by them is of the clearest, strongest and most undoubted character." (Page 92.)

In *The State v. Andrews,* 64 Kan. 474, 67 Pac. 870, the rule was stated in about the same form, except that it was intensified by an additional adverb:

"An enrolled statute imports absolute verity and is conclusive evidence of the passage of the act and of its validity, unless the journals of the legislature show *affirmatively,* clearly, conclusively and beyond all doubt that the act was not passed regularly and legally." (Syllabus.)

The application of this rule sustains the validity of the statute in question. The presumption of validity which goes with an enrolled bill can never be overthrown by entries in a journal which are themselves inconsistent and contradictory. The journal does not show "affirmatively, clearly, conclusively and beyond all doubt" that the bill failed to receive a constitutional majority. It is true that the entry of the yeas and nays on the roll-call shows but eighty-three affirmative votes, but there is a later entry in the same journal that a constitutional majority did vote for the measure and that the bill passed. The duty devolved upon the speaker, with the assistance of the clerk, to ascertain how many votes were cast for and against the bill, and to decide whether a constitutional majority had voted for its passage. The votes were counted and a decision was made by the presiding officer that a suffi-

cient number of the members had voted for the bill to pass it, and this decision was entered upon the journal. As the constitution requires each house to keep a journal of its proceedings, a determination and declaration by the house that a constitutional majority of the votes had been cast for the bill was an important proceeding of that body and one properly recorded in its journal.

It is suggested that the record of the yea-and-nay vote is a more detailed statement of the proceedings and necessarily better evidence of the legislative action than the statement of the count and decision made by the presiding officer. Each is required to be entered upon the journal, and there is nothing in the language of the constitution indicating that one is paramount to the other. If it be granted that, in its nature, the entry of the yea-and-nay vote is more convincing than the entry of the decision that the requisite votes had been cast, the repugnancy and contradiction in the journal remain. The fact that the journal contains entries directly opposed to each other—entries which cannot be reconciled, so that to accept one would be to disregard the other—gives rise to a doubt of the accuracy of the journal itself and makes it clear that under the rule such evidence cannot be used to impeach and overthrow a duly authenticated statute.

The rule was applied to a somewhat similar state of facts in the case of *In re Vanderberg, Petitioner, &c.,* 28 Kan. 243, where it was claimed that an act creating a judicial district did not receive a constitutional majority of the house of representatives. Some entries in the journal indicated that a majority voted for the bill, while other entries were to the effect that the legal votes cast for the bill lacked one of making the needed majority. After pointing out the repugnant statements in the journal, and showing that upon its face it was conflicting and ambiguous, the court remarked that "the enrolled statute is not to be set aside

upon mere guesses or surmises, nor upon a doubtful interpretation of a journal seemingly contradictory upon its face." (Page 257.)

In explanation of defects and inconsistencies found in the journals of the legislature it has been said that they are "hurriedly and sometimes carelessly made. The reading of the same for correction and approval from day to day is frequently dispensed with, and therefore it is not difficult to account for ambiguities and inaccuracies that may be found therein." (*Homrighausen v. Knoche*, 58 Kan. 646, 649, 50 Pac. 879.) Under the methods used in taking and recording the votes of the members mistakes may readily be made. As all familiar with legislative proceedings know, the clerk uses a printed roll of the members' names, with a column for the yeas on one side and a column for the nays on the other, and as the members answer to the roll-call a check-mark or figure is placed in the yea or nay column, opposite the names. Sometimes there is a second call of those absent or not voting on the first call, and if they respond other marks are made to designate their presence and the votes cast. Occasionally, members change their votes on a measure, and this requires a change of the marks already made on the roll; and all must be made amid the hurry and distraction of a busy legislature. The journal is made up at a later time from this and like memoranda, and it is easy to see how errors might creep into a record made in this way. In speaking of the manner in which the proceedings of the legislature are recorded, and the weight to be given journal evidence, this court has said:

"It is no reflection upon legislative integrity, no criticism of legislative methods, to say that the journals of the houses are often carelessly, inaccurately and partially kept. They are often hurriedly made up, written by clerks having little aptitude for the work and slight sense of responsibility in its performance. Upon many days, especially as the session ad-

vances; the business accumulates, the saving of time becomes important, and the reading of the journal of the preceding day is dispensed with, so that mistakes fail of correction and unfortunately pass into forms of legislative history. It is also a notorious fact that in many cases, to a great extent in all cases, the journals are not made up until after the legislative session has closed. They are then put into such methodical shape as can be done, made up of the loose and disconnected memoranda noted from day to day as the legislative session progressed. These facts justify courts in attaching less weight to journals of legislative proceedings as evidence of the non-enactment of laws than they would otherwise possess." (*In re Taylor,* 60 Kan. 87, 93, 55 Pac. 340.)

It appears that on the morning following the passage of the bill in question the house dispensed with the reading of the journal, and that may account in some measure for the failure of the house to notice or correct the inconsistency of the entries in the journal. However that may be, it is clear that these entries involve too much of inconsistency and doubt to impeach or overthrow a properly authenticated statute.

Judgment is therefore rendered in favor of the defendants.

GREENE, BURCH, SMITH, GRAVES, JJ., concurring.

MASON, J. (concurring specially) : I am unable to discover any ambiguity or inconsistency in the entry made upon the house journal relative to the passage of the bill creating the thirty-eighth judicial district. As I view the matter, the recital that the bill had received a constitutional majority, following the record of the roll-call showing eighty-three affirmative votes, cannot be construed as a declaration that more than eighty-three members had voted for it, but merely indicates that the house, rightly or wrongly, regarded eighty-three votes as making a constitutional majority. The entry was obviously made upon the supposition that eighty-three votes were enough to pass the bill, and I believe that the supposition was correct.

The record in the house journal regarding the bill which in *The State, ex rel., v. Francis, Treas'r,* 26 Kan. 724, was held not to have received sufficient votes for its passage also contained a recital that a constitutional majority had voted in the affirmative. (House Jour., 1879, p. 969.) The matter was not referred to in the opinion, but it might well have been said that the recital was to be interpreted in the light of the detailed roll-call by which it was preceded, which showed that some votes were cast by persons whom the court held not to have been lawful members of the house, and that as so interpreted it meant merely that the house believed that those recorded as voting in favor of the bill constituted a legal majority.

The constitutional provision is that new judicial districts may be created "whenever two-thirds of the members of each house shall concur." (Const., art. 3, § 14; Gen. Stat. 1901, § 161.) Where a two-thirds vote (or other proportion) of a legislative body is prescribed as necessary for any purpose, two-thirds of those who are present and constitute a quorum is understood, unless special terms are employed clearly indicating a different intention. (Cooley's Const. Limit., 7th ed., 201, note 2; *Cotton Mills v. Commissioners,* 108 N. C. 678, 13 S. E. 271; *Green v. Weller et al.,* 32 Miss. 650; *Warnock v. Lafayette,* 4 La. Ann. 419.) This is the legislative construction placed upon the provision of the federal constitution that a bill shall become a law notwithstanding the president's veto, "if approved by two-thirds of" each house. (U. S. Const., art. 1, § 9. See *The United States v. Alice Weil et al.,* 29 Ct. of Cl. 523, 539.) A contrary view is announced in *State v. Gould,* 31 Minn. 189, 17 N. W. 276.

A purpose to impose a more rigid requirement—that two-thirds of the entire membership of a body must unite upon a measure in order to make it effective— is usually indicated by using the phrase "two-thirds of all the members *elected.*" How generally this has

been recognized as the appropriate method of evidencing such purpose is shown by the fact that the language quoted is found in the veto section of the constitutions of no less than nineteen states. And the force of the word "elected" is illustrated by the circumstance that in ten other state constitutions the corresponding expression is "two-thirds of all the members *present.*" In seven states the form of the federal constitution is followed in this regard. Our constitution requires that two-thirds of all the members *elected* to each house must concur for its amendment (Const., art. 14, §§ 1, 2; Gen. Stat. 1901, §§ 225, 226) or for the passage of a bill over the governor's veto (Const., art. 2, § 14; Gen. Stat. 1901, § 132) ; that two-thirds of all the senators *elected* must agree in order that a conviction may be had in impeachment proceedings (Const., art. 2, § 27; Gen. Stat. 1901, § 145) ; and that a bill to become a law must be voted for by a majority of all the members *elected* to each house (Const., art. 2, § 13; Gen. Stat. 1901, § 131). The very fact that the word "elected" is used in these several instances and omitted in the one under consideration is a sound argument that the same meaning is not intended. Verbal differences in constitutions are rightfully given greater weight than in the case of statutes. "Constitutions import the utmost discrimination in the use of language." (*Greencastle Township, &c., v. Black,* 5 Ind. 566, 570.)

But a more effective argument to the same purpose is found in the history of section 14. It was taken with various changes from section 15 of article 4 of the Ohio constitution of 1851, the words of which, so far as here important, were: "Whenever two-thirds of the members *elected* to each house shall concur therein." "Therein" was stricken out as superfluous on the recommendation of the committee on phraseology (Proc. Const. Conv., 1859, p. 355), but "elected" was omitted from the draft prepared by the judiciary committee (Proc. Const. Conv., 1859, p. 67.) It can-

not be supposed that the omission was inadvertent. Precisely the same change is seen in section 15 of article 3 of our constitution, empowering the legislature to remove certain officers "if two-thirds of the members of each house concur." (Gen. Stat. 1901, § 162.) The section is practically an exact transcript of section 17 of article 4 of the Ohio constitution, excepting that there the expression is "if two-thirds of the members elected to each house concur therein." The same distinction is shown, but from another angle, in the section relating to impeachment. The Ohio section (Const., art. 2, § 23) provides that "no person shall be convicted without the concurrence of two-thirds of the senators." The Kansas section (Const., art. 2, § 27; Gen. Stat. 1901, § 145) avoids a possible ambiguity by adding the word "elected," so that the sentence reads: "No person shall be convicted without the concurrence of two-thirds of the senators *elected.*"

To fail to attach significance to the omission of the word "elected" would be to disregard the most obvious and convincing guides to the ascertainment of the purpose of the constitutional convention. The omission ought not to be ignored, and if given any force at all it must be such as results in interpreting the section to mean that a bill creating a new judicial district, in addition to receiving a majority of all the members elected to each house, must receive the support of two-thirds of all the members present when the vote is taken. The bill here involved received such support, as shown by the record, and was duly passed.

That this interpretation is in accordance with the intention of the framers of our fundamental state law further appears from this: Much opposition was developed in the convention to giving the veto power to the governor. The section relating to this matter was reported in substantially its present form. (Const., art. 2, § 14; Gen. Stat. 1901, § 132. See Proc. Const. Conv., 1859, p. 39.) Various motions were made to

curb the governor's power in this connection. The first was to strike the section out entirely. This being lost, it was then moved to substitute "a majority" for "two-thirds" in the provision requiring the approval of "two-thirds of the members *elected*" to override a veto. This likewise failing to carry, a third unsuccessful motion was made merely to strike out "elected" where used in this connection. (Proc. Const. Conv., 1859, p. 63.) This demonstrates that the attention of the convention was sharply called to the importance of the word in such a phrase as that under consideration and to the necessary effect of its omission.

I prefer to base my concurrence with the decision of the court upon the proposition that, only eighty-five members of the house being shown to have been present, eighty-three affirmative votes were enough to pass the bill.

PORTER, J. (specially concurring): The views expressed in the foregoing special concurring opinion have my approval.