THE STATE OF KANSAS, *ex rel. A. A. Godard, Attorney-general*, v. JAMES E. ANDREWS.

No. **13,000.** ( 67 Pac. 870.)

### SYLLABUS BY THE COURT.

1. CONSTITUTIONAL LAW—*Enrolled Statute Imports Absolute Verity — Title of Act.* An enrolled statute imports absolute verity and is conclusive evidence of the passage of the act and of its validity, unless the journals of the legislature show affirmatively, clearly, conclusively and beyond all doubt that the act was not passed regularly and legally, and this rule applies to the title as well as to the body of the act. The cases of *Homrighausen v. Knoche*, 58 Kan. 646, 50 Pac. 879, and *In re Taylor*, 60 id. 87, 55 Pac. 340, followed.

2. —————— *Biennial-election Law—Judges of the District Court—Appointment by Governor.* By the enactment of chapter 176, Laws of 1901, the legislature sought to make elections less frequent and to secure uniformity in the commencement and, therefore, the ending of official terms, and, as a part of the general design, it provided for an interim between the time of the ending of the terms of the then incumbents of certain judicial offices therein specified and the beginning of the terms of the regularly elected successors, and ordained that during such interim said offices should be filled by appointees of the governor. The creation of such exceptional terms and the method adopted for filling the same must be regarded as a part of the general design, and, because such provisions are consonant with the aim and purpose, clearly deducible from the act, and within the general and specific powers conferred upon the legislature by the constitution, they may not be adjudged invalid for the reason that a court may regard them as unwise, or because, if no means of supplying such offices during the interregnum resulting from the postponement of certain elections had been designated, such incumbents would have continued to hold until their successors, chosen in the usual manner, were qualified. *Wilson v. Clark*, 63 Kan. 505, 65 Pac. 704, cited and followed.

Original proceeding in *quo warranto*. Opinion filed February 8, 1902. *In banc.* Judgment for plaintiff.

*A. A. Godard*, attorney-general, and *J. S. West*, for plaintiff.

*G. C. Clemens, Waggener, Horton & Orr, Overmyer & Mulvane*, and *Rossington, Smith & Histed*, for defendant.

The opinion of the court was delivered by

ELLIS, J.: This is an action in the nature of *quo warranto* to determine the respective claims to the office of judge of the thirty-fifth judicial district of Charles E. Lobdell, whose due appointment and qualification under chapter 176, Laws of 1901, is admitted, and James E. Andrews, who was elected judge of said district at the general election in November, 1897, duly qualified, has ever since been and is now in possession of said office. If sections 3 and 4 of said act were lawfully adopted and do not contravene the constitution of this state, the prayer of the plaintiff must be granted and the office awarded to Charles E. Lobdell.

At the threshold of inquiry, we are met with the contention that said sections are ineffective because the corresponding part of the title to the act was not adopted in a constitutional manner by the legislature, which fact, it is claimed, is shown by, or fairly inferable from, the history of the bill recounted in the legislative journals. As originally introduced, the title to house bill No. 532, which subsequently matured into said chapter 176, was:

"An act to prescribe the time for holding elections for the election of all county officers except county commissioners, for the election of a clerk of the court of common pleas in Wyandotte county, and to repeal all acts and parts of acts in conflict therewith."

The subject-matter of sections 3 and 4 of the act as passed was not referred to directly in either the title or body of the bill when introduced. The journals, of the contents of which, under prior decisions, we take judicial cognizance, show that the number of the bill was never changed. From that of the house, it appears that under its number and original title, the bill, after several postponements, was passed, and messaged to the senate. In the senate journal for the day following the receipt of the bill is the following unexplained entry:

"House bill No. 532, An act to prescribe the time for holding elections for the election of all county officers except county commissioners, for the election of a clerk of the court of common pleas in Wyandotte county, and to repeal all acts and parts of acts in conflict therewith."

It is assumed by counsel for defendant that the foregoing entry relates to one of the readings of the bill. That is mere conjecture, and nothing in the context serves to justify an opinion as to the reason why the allusion to the measure was made. The same journal shows that on the next succeeding day action was taken upon the bill as follows;

"House bill No. 532, 'An act to prescribe the time for holding elections for the election of all county officers except county commissioners, for the election of a clerk of the court of common pleas in Wyandotte county, and to repeal all acts and parts of acts in conflict therewith,' was read the third time. Senator Smith moved to amend, by inserting the following as sections 3 and 4:

"'SEC. 3. On or before the second Monday of January, 1902, the governor shall appoint a judge for each of the following judicial districts, to wit: The tenth, fourteenth, fifteenth, seventeenth, nineteenth, twentieth, twenty-first, thirtieth, thirty-first, thirty-

second, thirty-third, thirty-fourth, and thirty-fifth, who shall hold their offices from the second Monday in January, 1902, until the second Monday in January, 1903. At the general election in 1902 a judge shall be elected in each of said judicial districts, who shall hold his office for a term of four years from. the second Monday in January, 1903, and there shall be a judge elected in each of said judicial districts at the general election every four years thereafter. No election for judge of the district court shall be held in said districts in the year 1901.

" 'SEC. 4. On or before the second Monday in January, 1904, the governor shall appoint a judge for each of the following judicial districts, to wit: The sixth, seventh, eighth, ninth, eighteenth, twenty-ninth, and thirty-sixth, and of the court of common pleas of Wyandotte county, who shall hold their offices from the second Monday in January, 1904, until the second Monday in January, 1905. At the general election in 1904 a judge shall be elected in each of said judicial districts and in said Wyandotte county, who shall hold his office for a term of four years from the second Monday in January, 1905; and there shall be a judge elected in each of said judicial districts at the general election every four years thereafter. No election for judge of the district court shall be held in said districts in the year 1903.'

"The question being, Shall the bill pass? the roll was called, with the following result: Yeas 24, nays 6; absent or not voting, 10."

After giving the names of the senators voting, and those absent and not voting, the record proceeds: "A constitutional majority having voted in favor of the passage of the bill, the bill passed and the title was agreed to." On the same day the bill was messaged to the house, as follows:

"Also, passed house bill No. 532, 'An act to prescribe the time for holding elections of all county officers except county commissioners, for the election

of a clerk of the court of common pleas in Wyandotte county, and to repeal all acts and parts of acts in conflict therewith, with amendments.'"

Thereafter, and on the same day, the house journal shows that the following action was taken :

"Mr. Hallett moved that the house concur in the senate amendments to house bill No. 532, 'An act to prescribe the time for holding elections for the election of all county officers except county commissioners, for the election of a clerk of the court of common pleas in Wyandotte county, and to repeal all acts in conflict therewith,' and the question being, Shall the house concur in the senate amendments to the bill ? the roll was called, with the following result : Yeas 65, nays 31; absent or not voting, 29."

The result was immediately messaged to the senate, as follows :

"Mr. President : I am directed by the house to inform the senate that the house has concurred in senate amendments to house bill No. 532, 'An act to prescribe the time for holding elections for the election of all county officers except county commissioners, for the election of a clerk of the court of common pleas in Wyandotte county, and to repeal all acts and parts of acts in conflict therewith.'"

Two days later the house committee on enrolled bills made a report on this and several other bills which, so far as relevant, was as follows :

"Also house bill No. 532, 'An act to prescribe the time for holding elections for the election of all county officers except county commissioners, for the election of a clerk of the court of common pleas in Wyandotte county, and to repeal all acts and parts of acts in conflict therewith.' . . .

"Have compared the engrossed copies with the enrolled bills, and I am directed to report to the house that the same are correctly enrolled, that all have been properly signed by the president and secretary of

the senate and the speaker and chief clerk of the house, and have been presented to the governor for his approval, this 1st day of March, 1901."

On the day of the receipt of the bill by the governor, he returned the same to the house with the following message :

"*To the House of Representatives*—GENTLEMEN :  I have this day approved the following : House bill No. 532, 'An act to prescribe the time for holding elections for the election of all county officers except county commissioners, for the election of a clerk of the court of common pleas in Wyandotte county, and providing for the appointment and election of judges in the tenth, fourteenth, fifteenth, seventeenth, nineteenth, twentieth, twenty-first, thirtieth, thirty-first, thirty-second, thirty-third, thirty-fourth, thirty-fifth, sixth, seventh, eighth, ninth, eighteenth, twenty-ninth and thirty-sixth judicial districts, and judge of the court of common pleas of Wyandotte county, and to repeal all acts and parts of acts in conflict therewith.'

W. E. STANLEY, *Governor.*"

Thus it appears that the first recital in either journal, and the only one, in fact, of that portion of the title which is requisite to sustain said sections 3 and 4, is contained in the message of the governor announcing his approval of the act.  As to when the amended title was adopted the record is silent.  That so much of the bill as is pertinent to the issues herein may not be upheld unless it can be determined that such amended title was in fact adopted in substantial conformity with constitutional requirements is admitted.

.  In the case of *Homrighausen v. Knoche,* 58 Kan. 646, 50 Pac. 879, it was said :

"The enrolled bill, duly authenticated, is evidence, of the highest character, of legislative action.  In many of the states it is conclusive evidence that all the con-

stitutional requirements necessary to the passage of an act have been complied with. In this state, however, where journals of the legislative proceedings are required to be kept, they may be consulted as to whether a published act was actually passed. In determining what was the action of the legislature on any particular measure, the validity of which is challenged, the court may 'take judicial notice of what our books of published laws contain, of what the enrolled bills contain, of what the journals of the legislature contain, and indeed of everything that is allowed to affect the validity of any law, or that is allowed to affect or modify its meaning in any respect whatever.' (*Division of Howard County*, 15 Kan. 213.) To measure the value and force of the information and the evidence so obtained, it has been held that the enrolled statute 'is very strong presumptive evidence of the regularity of the passage of the act and of its validity, and is conclusive evidence of such regularity and validity unless the journals of the legislature show clearly, conclusively, and beyond all doubt, that the act was not passed regularly and legally.

" 'If there is any room to doubt as to what the journals of the legislature say; if they are merely silent or ambiguous; or if it is possible to explain them upon the hypothesis that the enrolled statute is correct and valid, then it is the duty of the courts to hold that the enrolled statute is valid. But in this state, where each house is required by the constitution to keep and publish a journal of its proceedings, we cannot wholly ignore such journals as evidence.' " (*The State, ex rel., v. Francis*, 26 Kan. 724.)

From this decision and those quoted therein, together with that of *In re Taylor*, 60 Kan. 87, 55 Pac. 340, may be deduced the canon which has obtained in Kansas for the past two decades. So far as the same is appropriate to the case at bar, it may be epitomized as follows : An enrolled statute imports absolute verity and is conclusive evidence of the passage

The State v. Andrews.

of the act and of its validity, unless the journals of the legislature show affirmatively, "clearly, conclusively and beyond all doubt that the act was not passed regularly and legally."

Nearly all of the matter above quoted from the journals is obnoxious to the objection that it is not primary evidence, and so much of it as tends to show irregularity is not required by the constitution to be entered on the journals at all. The provision requiring such journals to be kept is section 10, article 2, as follows:

"Each house shall keep and publish a journal of its proceedings. The yeas and nays shall be taken and entered immediately on the journal, upon the final passage of every bill or joint resolution. Neither house, without the consent of the other, shall adjourn for more than two days, Sundays excepted."

The writer believes, in view of the facts narrated and those which will be presently stated, that the rule of the common law, which made an authenticated act of parliament conclusive and unimpeachable, is safer, and more likely to lead to results in consonance with the real facts, and to be free from the criticism, to which any other and less stringent precept is exposed, that by its application the lawfully expressed will of one coordinate branch of government may be thwarted by another. That ancient regulation has been recently indorsed and applied by the courts of last resort in many states where previous adjudication has not deterred judicial tribunals from being guided by principles which observation and experience prescribe as necessary, as well as conducive, to the public welfare and the maintenance of that respect which is due to the completed work of those who are invested with the power to create laws. In the case we are consid-

31—64 KAN.

ering, to sustain the parts of the act challenged, it is only necessary to invoke the aid of the rule which has hitherto prevailed in Kansas. Therefore, we are not called upon to abrogate it.

The title to this act is enrolled as it is published in the session laws. It appearing that the title had in fact been amended, the presumption is that it was so amended regularly and legally, and this presumption must prevail, unless it be affirmatively, "clearly, conclusively and beyond all doubt" shown by the journals, or one of them, that it was illegally or irregularly amended. If, after the passage of the bill by the senate, the record of the house journal had shown that the title was there amended, there would be ground for saying that, because the senate had not acted on such amendment and lawfully given its assent thereto, the concurrence of the two houses to such amendment had not been secured, for which reason it had not been rendered efficient. Again, if the record of the senate had averred that the title and the act itself were there amended, and that of the house had asseverated that, while that assembly had concurred in the amendment to the body of the bill it had refused to concur in the title as changed, then it might be said that the house journal fairly impeached the bill as enrolled.

It will be noted, however, that, while it is set forth in the senate journal that Senator Smith offered certain amendments which appear in the act, it is not stated that those amendments were adopted, or that any amendments whatever were adopted; and for information in relation thereto, if we were confined to the journals themselves, we would be compelled to resort to the statement in the house journal, which, at best, is but secondary evidence, that in the message

from the senate it was alleged that the bill had been passed with amendments.   Thus, in order to sustain sections 3 and 4, if their authenticity should be disputed, we would be required to infer that because Senator Smith "moved to amend by inserting" said sections, and because they are contained in the bill as enrolled, they were in fact adopted by the senate.

Just as we find these sections in the bill as enrolled, we also find the amended title.   Aided by the presumption that the title was legally enacted by the legislature, may we not, with equal propriety, infer that it was, as it should have been, made by amendment sufficiently comprehensive to give effect to said sections at the same time and as a part of the same action ?   The proposition that such a deduction may not be made because the senate journal recites that "the title was agreed to" is not cogent, and is tantamount to an intimation that, in order to overthrow that which we are bound to support if it may be done lawfully, we ought to conclude from the ambiguity of the statement that the senate had solemnly performed a farce under the guidance of the chairman of its judiciary committee.   It cannot be claimed that such statement tends to show whether the title which was "agreed to" was the original title or that which the bill, at some point on its journey, acquired, and which it ought to have taken then and there.   Without so much as a hint to excuse it, we should hesitate to say that the probabilities favor a conclusion that the senate deliberately amended a bill by inserting two sections which, because not referred to in the title, were absolutely void.

The fact that the senate messaged the bill back to the house under the original title can have no weight in this discussion, because the record shows that,

without exception, the title was thus given in each of the messages which passed between the two houses relating to the bill. Not only is that true, but it shows that the house committee on enrolled bills, after it made, or should have made, examination and comparison with the engrossed copy of the bill, reported it as enrolled under its original title. Under these circumstances, to say that the act is to be upheld by a presumption that it was legally passed, and then to announce that such presumption is to be overwhelmed by entries in legislative journals which prove affirmatively, "clearly, conclusively and beyond all doubt" their own utter unreliability, is to give judicial sanction to a flagrant inconsistency.

The far-reaching effect and the disastrous results which would follow such a decision as counsel for defendant seek to have made will be discerned if we briefly advert to the entries in those same legislative journals which relate to other bills which have hitherto been deemed to have been enacted into laws. Of the bills introduced in the house in the legislative session of 1901 which were finally passed by both houses and approved by the governor, the titles of thirty-five, as they appear in the session laws, were changed during the progress of the bills and prior to the approval of the governor. It is shown by the journals that but two titles of bills which assumed the amended titles thereafter were formally amended. The titles to twenty were amended at some stage of their course before they were signed by the governor, but there is no entry in either journal making any reference thereto. Of these, sixteen stand in precisely the same attitude in all essential respects as does the act we are considering. As to these last, the first evidence of a change in the title is found in the mes-

sages from the governor announcing his approval of the bills.   In most cases a recital appears in the journal of one or both houses that "the title was agreed to," but in no instance, as to the twenty bills above referred to, is there any intimation of a change in the title. As to one bill, the house journal shows that the title was materially amended.   If we may believe the senate journal, it was messaged to that body under a title it never had, and, after action by the senate, it was messaged back to the house under a title different from either of the others.   It was enrolled under still another title, and signed by the governor under a title which it had never before assumed.   Still, upon scrutiny of the enrolled bill, it fairly appears that the title was only once amended, and no reason why it should have traveled under so many different appellations is manifest.   An examination of the journals of other sessions of the legislature during the past ten years reveals even greater incongruities and more important omissions than do those of 1901.

Returning from this digression, we quote with approval the language of Mr. Chief Justice Doster, in the case of *In re Taylor*, supra:

"Therefore, within the rule before declared and now reaffirmed, the mere silence of the legislative journals as to whether amendments were made to a pending bill is not sufficient to impeach the measure which finally appears in the form of an enrolled, certified and approved enactment containing the amendments.

"It is no reflection upon legislative integrity, no criticism of legislative methods, to say that the journals of the houses are often, carelessly, inaccurately and partially kept.   They are often hurriedly made up, written by clerks having little aptitude for the work and slight sense of responsibility in its performance.   Upon many days, especially as the session ad-

vances, the business accumulates, the saving of time becomes important, and the reading of the journal of the preceding day is dispensed with, so that mistakes fail of correction and unfortunately pass into forms of legislative history. It is also a notorious fact that in many cases, to a great extent in all cases, the journals are not made up until after the legislative session has closed. They are then put into such methodical shape as can be done, made up of the loose and disconnected memoranda noted from day to day as the legislative session progressed."

To this, with propriety, it may be added that those who are at all familiar with the usual course of transacting business in legislative bodies, unless they happen to be judges of courts of record, know that it is customary for the clerks who prepare messages, reports, and even the journals themselves, to clip the titles from bills and use such clippings, instead of writing out the message, report, or journal entry. As a bill is rarely reprinted because of a change in the title, the original title is most frequently used, because the printed bill containing it is available.

It follows that, under the rules heretofore enunciated by this court, the title to the act in controversy must be held to have been legally adopted.

We are aware that the case of *Webster v. The City of Hastings*, 59 Neb. 563, 81 N. W. 510, declares a doctrine which, by fair implication, is opposed to the position we have taken. In that case a bill was at all times referred to under its original title up to the time of the report of the committee on engrossed and enrolled bills in the house where the bill originated, and in such report the amendment to the title appeared ; in other words, the journals of both houses were absolutely silent as to whether any amendment to the title had occurred, and the court said :

"That the title was changed by inserting therein

the words 'the title and' after the bill had passed the legislature, and while it was being prepared for the signature of the executive, is a conclusion that cannot be avoided without disregarding entirely the evidence of the legislative journals.   This, under what is now the settled doctrine of this court, we cannot do.''

Without expressing an opinion as to whether that decision conforms to the rule announced by the court which made it, we unfalteringly assert that it can have no application under ours.   We are constrained to quote again the language of the chief justice: ''Therefore, within the rule above declared and now reaffirmed, the mere silence of the legislative journals as to whether amendments were made to a pending bill is not sufficient to impeach the measure.''   (*In re Taylor*, supra.)   The most that could be said of the effect of silence on the part of the journals in the Nebraska case would be that such silence raises a doubt as to whether the bill was properly amended or not, and this court has held, in *Chesney v. McClintock*, 61 Kan. 94, 58 Pac. 993, that such doubt is not sufficient to destroy the act.   In *State v. Burlington & M. R. R. Co.*, 60 Neb. 741, 84 N. W. 253, it was said: ''It is certain that the enrolled bill with the title it now contains was not read in the house on three different days; hence it could not become a valid law.'' If it should be held that a bill, in order to become a law, must be read three times in each house, on separate days, under the title finally adopted, it is probable that such holding would invalidate every law on our statute-books the title to which was amended in either branch of the legislature.   See, as bearing upon such a rigid construction, *Division of Howard Co.*, 15 Kan. 195.

It is persistently urged that sections 3 and 4 are

unconstitutional because they provide for the appointment by the governor, for the period of one year, of judges in the judicial districts enumerated. We are cited to the following sections of the constitution as supporting this contention:

"The state shall be divided into five judicial districts, in each of which there shall be elected, by the electors thereof, a district judge, who shall hold his office for the term of four years. District courts shall be held at such times and places as may be provided by law." (Art. 3, § 5.)

"All the judicial officers provided for by this article shall be elected at the first election under this constitution, and shall reside in their respective townships, counties or districts during their respective terms of office. In case of vacancy in any judicial office, it shall be filled by appointment of the governor until the next regular election that shall occur more than thirty days after such vacancy shall have happened.

"All judicial officers shall hold their offices until their successors shall have qualified." (Art. 3, §§ 11, 12.)

"Justices of the supreme court and judges of the district courts may be removed from office by resolution of both houses, if two-thirds of the members of each house concur. But no such removal shall be made except upon complaint, the substance of which shall be entered upon the journal, nor until the party charged shall have had notice and opportunity to be heard." (Art. 3, § 15.)

Counsel for plaintiff cite, as bearing on the question:

"The legislature shall prescribe the time when its acts shall be in force, and shall provide for the speedy publication of the same; and no law of a general nature shall be in force until the same be published. It shall have the power to provide for the election or appointment of all officers, and the filling of all vacancies not otherwise provided for in this constitution." (Art. 2, § 19.)

"All officers whose election or appointment is not otherwise provided for shall be chosen or appointed as may be prescribed by law." (Art. 15, § 1.)

The validity of this act as a whole and, by necessary inference, the constitutionality of the particular provisions now challenged, were sustained by this court in the case of *Wilson v. Clark*, 63 Kan. 505, 65 Pac. 705. The legislative purpose was therein stated as follows :

"The act in question undertakes to revise the electoral system and readjust the beginning of terms, by providing that all county officers, except county commissioners, shall be chosen at the same general election, and that judicial officers shall only be elected every two years, when state and county officers are elected. To accomplish this purpose and introduce uniformity, the election of county officers who would, under the old order of things, have been chosen at the election in 1901, was postponed until the election in 1902, and judicial elections which would have occurred in certain districts in the odd years were postponed for one year, and required to be held in the even years. This action necessarily left an interregnum of one year between the end of one regular term and the commencement of another, and as to the judicial officers, the act provided that the interval should be filled by appointment of the governor, leaving the interregnum, so far as the county offices are concerned, to be supplied under the general provisions of the law."

It was also said :

"It is next contended that the postponement of the election of certain officers for a year is against the constitutional policy that officers shall be chosen by election, and also contravenes the provision fixing the terms of such officers. No constitutional provision has been found which expressly or by implication limits the legislature in fixing the terms of district judges and county officers. A limit to the duration of terms is prescribed, but when the terms shall begin

and end is fairly within the authority and discretion of the legislature. That body possesses full legislative power, except such as is expressly or impliedly withheld by the state constitution or by the constitution and laws of the United States." . . .

"The policy of the statute, as we have seen, is to secure uniformity in the beginning of official terms, and also to avoid the expense, agitation and other disadvantages of frequent elections. The postponement of elections for one year is a reasonable and, in fact, the only practicable method of accomplishing the beneficial purpose of the legislature. If the legislature had postponed elections an unreasonable length of time, longer than was necessary to effect the avowed purpose, and so long as to betray an intention to make the offices appointive by preventing the people from choosing their officers at stated intervals and for regular terms, or, if it appeared that it was done merely to extend official terms and as a favor to incumbents of offices, there might be occasion for judicial interference and condemnation." . . .

"It is true, as argued, that the legislature cannot make the judicial and county offices appointive rather than elective ; and it is also true, as was remarked by Justice Valentine in *Rice v. Stevens*, 25 Kan. 302, that 'the theory of our law is that officers shall be elected whenever it can be conveniently done ; and that appointments to office will be tolerated only in exceptional cases.' Here we have an exceptional case. The constitution requires that these officers shall be elected for regular terms, and if provision is made for such elections for regular terms the requirement of the constitution is satisfied. From the beginning it has been held that the legislature had the power to provide for interregnums, or exceptional terms, intervening between regular terms, or before the commencement of terms as established by law. In *Hagerty v. Arnold*, 13 Kan. 383, it was held that, the constitution having fixed the terms of offices, the legislature cannot make them more nor less, but for vacancies or exceptional terms the legislature has the power to say how the offices shall be filled up to the time when the

regular terms commence, even if it requires two elections in one year." (Citing many Kansas cases.)

"In making provisions for exceptional terms, or interregnums, arising from a change in the time of elections, the constitutional right of no officer is infringed. He is entitled to hold his office for the fixed term for which he was elected and until his successor has qualified. He does not hold, as in some of the states, until his successor is elected and qualified, but he holds over only till such time as his successor, who has been chosen according to law, has qualified and presents himself for the office. It will be observed that in some of the cases cited the vacancies or exceptional terms have been filled by provisional appointments, and in others that the incumbents have been permitted to hold over until the beginning of the regular term. It is immaterial whether the interval between the regular terms is called a vacancy, an interregnum, or an exceptional term. Whatever it is, there is no doubt power in the legislature, under the authorities cited, to make provision for the occupancy of the office until the beginning of the next regular term, and the fact that an appointment is provided for will not render the act invalid. The question of legislative power to postpone elections and readjust the commencement of official terms has been affirmatively decided by courts of other states, and most of them have constitutional limitations upon the terms and tenure of officers similar to those found in our own constitution. The exercise of the power has been generally sustained." (Citing many decisions of other states. See, also, *The State, ex rel., v. Albert*, 55 Kan. 154, 40 Pac. 286.)

In the second paragraph of the syllabus in the same case it was held:

"For the purposes named the legislature has constitutional power to readjust the commencement of official terms by postponing elections for a reasonable time, and provisions for the filling of the offices during the interval between the end of one regular term and the commencement of another are not invalid."

Thus are disposed of, by a decision of this court relating to the same act, all of the questions here presented, with the possible exception of one. It is urged that the act, in providing for the appointment of a judge for the period of one year, is violative of that clause of section 11 of article 3 of the constitution which provides: ''In case of vacancy in any judicial office, it shall be filled by appointment of the governor until the next regular election that shall occur more than thirty days after such vacancy shall have happened.''

It may be remarked that in this case there is no such vacancy as is contemplated in the constitutional provision just quoted. Pursuant to the scheme of the legislature to make elections less frequent, and to secure uniformity in the commencement and, therefore, the ending of official terms, it provided for an interim between the time of ending of the term of the then incumbent and the beginning of the term of the regularly elected successor, and it ordained that during such interim certain judicial offices should be filled by appointees of the governor. That was a part of the general design, and, because it is consonant with the aim and purpose of the lawmaking tribunal, clearly deducible from the act, and if within its power, it would be an arrogation of authority on the part of this court to criticize or condemn the law because we might believe that a particular provision was unnecessary or unwise. Confessedly, if no provision had been made for filling the judicial offices during the exceptional term created, the incumbents would have continued to hold until their successors, chosen in the usual manner, were qualified. Possibly that will be the product of the law in its application to county officers, or an exception may be declared to exist as to

The State v. Andrews.

sheriffs and treasurers who have held two full terms, for which reason it may be adjudged that they are ineligible to hold for the exceptional one created by this act.   Upon these matters we express no opinion. That the effect of the act, when construed with reference to constitutional inhibitions and former adjudications of this court, may be to make some of the county officers hold over under existing laws, and to require that such sheriffs and treasurers be appointed to fill such interval, is but a manifestation of legislative discretion, into the wisdom of which we may not inquire.   We intend no intimation that such will be be held to be the consequence of the act, and only announce a belief that if, in an action directly involving the question, it should be so determined, mere considerations of desirability would not suffice to nullify the provision.

The fact that the legislature expressly determined that, during the official period intervening the termination of the then existing regular terms of the judges in the districts named in the act and the second Monday in January following such termination, the offices held by them should be filled by appointment of the governor, was, and is, a matter included within the general legislative power with which the legislature is invested by the constitution, and, being so, its validity is not affected by the consideration that the public welfare would have been as well or better subserved if the action had not been taken.   No constitutional term was thereby abbreviated, and no intention was betrayed to interfere with or deprive a judge of any of his vested rights.   (*Wilson v. Clark*, supra, and authorities cited.)

It will be observed that there is an ambiguity in the language of the constitutional provision which

authorizes a vacancy to be filled by appointment of the governor until the next regular election. If this must be literally construed, what does it mean? Do the appointees of the governor hold only until the close of election day, or until the close of the succeeding Friday, when the returns are canvassed by the county board, or until the returns from the counties constituting the district are canvassed by the state board, several weeks later, or until a certificate of election is issued to the prevailing candidate? Or, suppose that in a given district some of the qualified electors should be absent, employed in the militia or volunteer military service of the state or of the United States, and the place of voting should be so far distant that the returns could not be received in time to be canvassed by the state board in November, but could be within a fortnight thereafter, would the candidates running for the short term between the time of the election, or whenever it may commence, and the second Monday of January following, be deprived of the votes of such absent electors? In case of such ambiguity legislative construction of a constitutional provision is often of value, and in this state, when new districts have been created by the legislature, it has usually been provided in the act that the appointees of the governor should hold until the second Monday in January following the next regular election, and that at such election a judge should be chosen whose term did in fact begin at the time last indicated, whether it was so nominated in the act or not. This is not presented as a controlling proposition, and it is, perhaps, of little moment, for it is clear that the legislature did not transcend its authority in extending the interval which it created beyond "the next regular election," whatever that may mean. It

The State v. Andrews.

is only suggested as one of the considerations which may have influenced the legislature in exercising such authority.

In the view we have taken, and under the prior decisions of this court sustaining the creating by legislative enactments of exceptional terms, none of the authorities presented by defendant in this case is applicable.  No one of those cases relates to an exceptional term established by special legislation, with authority thereby granted to the executive to supply the same, but in nearly every instance they refer to and condemn an attempt on the part of the governor to interfere and act as though a vacancy existed, when not authorized by law so to do.  No argument is necessary to prove the inapplicability of that class of cases.  Of these and the others, it may be said that most of them are based upon constitutional provisions which allow an officer, in addition to his term, to hold until his successor is elected and qualified.

The authorities are substantially agreed that there is a broad distinction between the meaning of the words "elected and qualified" and that of "qualified" alone, and the distinction is based upon the consideration that the word "elected" has a well-defined and universally recognized meaning, and that when used it may not be assumed that the constitution framers intended it should have no significance, and might, therefore, be ignored.  That there was a purpose in leaving out the word "elected" in section 12, article 3, must be presumed from the fact that in section 1, article 1, which applies to officers of the executive department, it is expressly provided that they shall "hold their offices for the term of two years from the second Monday in January next after their election, and until their successors are elected and

qualified." There is no ground for saying that the word "elected" was accidentally omitted from section 12, article 3.

According to all the lexicographers, a successor is merely one who succeeds or takes the place of another. Two of the counsel for defendant present definitions of the word "successor," as applicable to section 12, article 3, of the constitution. These definitions are new, and display the ingenuity of counsel. One says : "Can the governor *appoint* a judge's *successor?* Can he be authorized by the legislature to do so ? We mean a successor within the meaning of section 12, article 3, of the constitution. A judge's successor, within the meaning of that section, is one chosen to fill the next regular term." The other counsel says : "A successor is one who follows in the next following term after that filled by the incumbent ; between the incumbency of one in office and that of his successor there can be no vacancy, because where the one ends the other begins." We fear either to embrace or to antagonize this last specification, for we are not sure we understand what is meant by the author. In their brief and argument, defendant's counsel ignore section 19 of article 2 of the constitution, which is plainly adequate to meet the requirements of the situation established by the law we are considering. A court should hesitate before consenting to be guided by a system of reasoning dependent upon a definition of ordinary words which may not be found in any dictionary, and no incentive, however potent it may be, can require such literal construction of one clause of the constitution as will result in the repudiation of others equally pertinent.

It is well said by counsel for plaintiff in their brief :

"Section 12, article 3, cannot be construed as if it

were the only provision of the entire instrument regarding tenure ; it must be treated as *in pari materia* with other equally significant and authoritative sections.   The fact that it empowers the incumbent to hold over, not until his successor is elected and qualified, but until he is qualified, is vitally important, and this language cannot be distorted or disregarded.

"To construe this section literally and regardless of all others is to give every judicial officer whose office has been created for a temporary period only a life tenure, because no successor could ever be chosen. Under so literal and cloister-like construction, a judge *pro tem.*, chosen in accordance with section 20, article 3—being unquestionably an officer, and a judicial officer—would hold until the bar should see fit to choose another judge *pro tem.*"

The absurdity of adopting such a construction is painfully apparent.   (*Hagerty v. Arnold*, 13 Kan. 383.)

We have discussed the insistence of counsel for defendant that the governor's appointees under this act may not hold beyond "the next regular election," because that particular topic was not adverted to in the opinion in *Wilson v. Clark*, supra, which we regard as determinative of the main question, to which this one is a mere incident.   If, as we there held, the legislature has the right to create an exceptional term and to provide for filling the office during its existence, in virtue of the dominion accorded to it by section 1 of article 2 of the constitution, which provides that "the legislative power of this state shall be vested in a house of representatives and senate," its jurisdiction is nowise abridged by the provision of section 2 of article 3, or by any other section of the constitution to which reference has been made.

Following, then, and approving the conclusions reached unanimously by this court in the case of *Wilson v. Clark*, supra, which, after reconsideration, we are

convinced are correct, and which are confessed and shown to be faultless by counsel for defendant, we find no difficulty in determining that the sections of the act assailed do not contravene any section of the constitution, that they were enacted in the lawful exercise of power vested in the legislature by that instrument, and must be upheld and respected by this court.

It is therefore ordered that the defendant, James E. Andrews, be ousted from the office of judge of the thirty-fifth judicial district of this state, and that he surrender the same to Charles E. Lobdell without delay.

JOHNSTON, SMITH, CUNNINGHAM, GREENE, POLLOCK, JJ., concurring.

DOSTER, C.J. (dissenting) : I dissent from the decision of this case. I dissent on the strength of the very rule invoked by the majority, that the enrolled bill is to be taken as conclusive evidence of its due enactment, "unless the legislative journals show affirmatively, clearly, conclusively and beyond all doubt to the contrary." The journals do show affirmatively, clearly, conclusively and beyond all doubt that the title of the act in question, as it appears in the enrolled bill and published statutes, was not adopted as the title of the act. They show so because, at every step in the progress of the bill, from its introduction to the report of the committee on enrolled bills made after its final passage in the house last acting on it, it is described by its original title, without a word anywhere indicating its amendment. *That* is an affirmative, a clear, conclusive and unquestioned showing that it was not amended. Short of an express negative declaration in the journals that no amendments

were made, there could not be a clearer showing of non-amendment of the title. No pretense is made that the title was amended until the bill reached the senate. The journal of that body shows that when put on its final passage it was described by its original title. This journal, after reciting that a constitutional majority voted in favor of the passage of the bill, also recited that "the title was agreed to." The house journal shows that after the passage of the bill in the senate it was messaged back to the house by its original title. That journal also shows that it was again passed in the house under its original title, and it also shows that the final act in its legislative history, to wit, its enrolment, was performed still under the same title. In the name of all that is reasonable, what more could be asked to constitute an affirmative, clear and conclusive showing that the title of the bill remained unchanged at every step of its progress through the two houses?

Now, the above recitals of legislative proceedings are not my inferences and conclusions. They are the facts set forth in the majority opinion by quotations from the legislative journals. Against the affirmative, unquestioned, clear and conclusive showing of non-amendment which they make, my associates justify their decision on the ground that, inasmuch as the body of the bill was so amended in the senate as to require a corresponding amendment of the title, it must be presumed that the latter amendment was made. I submit that the labored argument of my brother Ellis, extending over several pages, generalizes itself into that and nothing more—the title ought to have been amended because the bill was amended; therefore, it must be presumed that the former was amended. That sort of argument will not do. The

due performance of things which ought to have been done will be presumed in the lack of proof that they were not done, but the doing of them will not be presumed in the face of positive and undoubted evidence that such was not the case.

There is not a former decision of this court which gives countenance to the one now made. In both cases from which lengthy extracts were quoted, it was sought to impeach the enrolled bills by the ambiguity or mere silence of the journals. In *Homrighausen v. Knoche*, 58 Kan. 646, 50 Pac. 879, as stated in the syllabus, the entries in the legislative journals respecting the passage of the bill "were ambiguous and conflicting. Some of the recitals and entries indicated that a constitutional majority had voted for the bill, while others indicated the contrary." On that state of facts, it was said, as quoted in the majority opinion, "if there is any room to doubt what the journals of the legislature say; if they are merely silent or ambiguous; or if it is possible to explain them on the hypothesis that the enrolled statute is correct and valid; then it is the duty of the court to hold that the enrolled statute is valid."

In the case of *In re Taylor*, 60 Kan. 87, 55 Pac. 340, it was sought to impeach an enrolled bill by inferences derivable from the silence of the journal and omissions of statement from it as to the enactment of parts of the measure. Replying to the effort to do that for those reasons, it was said, as quoted in the majority opinion:

"Therefore, within the rule before declared and now reaffirmed, the mere silence of the legislative journals as to whether amendments were made to a pending bill is not sufficient to impeach the measure

which finally appears in the form of an enrolled, certified and approved enactment containing the amendments."

I insist that a legislative journal is not silent as to whether an amendment of the title of a bill was made which four several times after the time it is said to have been made describes the bill by its original title. Such a journal is as positive and unequivocal on the subject as though it had in terms declared that the amendment was not made.

The existence of similar defects in other measures adopted at the same session, if such be the fact, is of no moment whatever. It was dwelt on, however, as though it were important. It is true that "hard cases make bad law," but there can be no justification, because of the weight and moment of a case, for flying in the face of plain legal rules while at the same time professing adherence to them. Better abolish the rule and substitute one which it will not be necessary to violate while pretending to obey.

As to the other proposition in the case I am in much doubt. That the act empowering the governor to appoint is invalid I have no doubt. It is invalid because it assumes to vest the executive with a power of appointment to hold until January, 1903, when the constitution limits the time to the "next regular election" in November. I think the phrase "next regular election" may be extended by construction to mean "until the ascertainment of the next regular election," but under that provision thus construed the legislature cannot set the time for the induction into office, except as it sets the date for the canvass of the vote and the declaration of the result. However, independently of the legislative act, the governor has a

constitutional power of appointment, and it may be that the appointment made by him in this case was justified under his general authority. That depends upon the meaning of the word "vacancy" as used in the constitution, article 3, section 11, and on the validity of the legislative act under that and other constitutional provisions. As to those matters I am in doubt.