E. L. FISCHER v. J. McCABE MOORE.

No. 13,887. (76 Pac. 403.)

SYLLABUS BY THE COURT.

OFFICE AND OFFICERS—*Appointment of Judge of the Twenty-ninth Judicial District Held Valid.* The adoption of the biennial-election amendment to the constitution in the year 1902 did not repeal the biennial-election law of 1901 (Laws 1901, ch. 176), dispensing with the election of judges of the district court in the year 1903, and an appointment under that law of a judge for the twenty-ninth judicial district, to hold office from January, 1904, to January, 1905, is valid.

2. ——— *Case Followed.* The case of *Griffith v. Manning*, 67 Kan. 559, 73 Pac. 75, approved and followed.

Original proceeding in *quo warranto.* Opinion filed April 9, 1904. Writ denied.

*Nathan Cree*, and *Samuel Maher*, for plaintiff.

*C. F. & S. D. Hutchings*, and *Keplinger & Trickett*, for defendant.

The opinion of the court was delivered by

BURCH, J.: This action is original in this court. It involves the title to the office of district judge of the twenty-ninth judicial district. At the general election of 1899 the plaintiff was elected to the office named,

the duties of which he assumed upon the second Monday in January, 1900. He continued in the exercise of such duties for a term of four years, ending on the second Monday in January, 1904. Under the law as it existed at the time of his election, the plaintiff's successor would have been elected in the odd-numbered year 1903.

At the time of the plaintiff's election the constitution contained the following provisions material to an exhibition of his claims:

"General elections shall be held annually on the Tuesday succeeding the first Monday in November. Township elections shall be held on the first Tuesday in April, until otherwise provided by law." (Art. 4, § 2.)

"All county officers shall hold their offices for the term of two years, and until their successors shall be qualified, except county commissioners, who shall hold their offices for the term of three years; provided, that at the general election in the year eighteen hundred and seventy-seven the commissioner elected from district number one in each county shall hold his office for the term of one year, the commissioner elected from district number two in each county shall hold his office for the term of two years, and the commissioner elected from district number three in each county shall hold his office for the term of three years; but no person shall hold the office of sheriff or county treasurer for more than two consecutive terms." (Art. 9, § 3.)

"Township officers, except justices of the peace, shall hold their offices one year from the Monday next succeeding their election, and until their successors are qualified." (Art. 9, § 4.)

The constitution also provides as follows:

"All judicial officers shall hold their offices until their successors shall have qualified." (Art. 3, § 12.)

At its session in the year 1901 the legislature passed

Fischer v. Moore.

a resolution submitting to the people an amendment to the constitution in the following terms :

"*Senate Concurrent Resolution No. 5*, Proposing an amendment to the constitution relating to and providing for biennial elections.

"*Be it resolved* by the legislature of the state of Kansas, two thirds of the members elected to each house thereof concurring therein :

SECTION 1. The following proposition to amend the constitution of the state of Kansas is hereby submitted to the qualified electors of the state for their approval or rejection, to wit : The constitution of the state of Kansas is hereby amended by striking out the whole of section 2 of article 4, and sections 3 and 4 of article 9, of said constitution, and inserting in lieu of said sections the following, which shall constitute section 2 of article 4 of the constitution : Sec. 2. General elections and township elections shall be held biennially on the Tuesday succeeding the first Monday in November in the years bearing even numbers. All county and township officers shall hold their offices for a term of two years and until their successors are qualified ; provided, one county commissioner can be elected from each of three districts, numbered 1, 2, and 3, by the voters of the district, and the legislature shall fix the time of election and the term of office of such commissioners ; such election to be a general election, and no term of office to exceed six years. All officers whose successors would, under the law as it existed at the time of their election, be elected in an odd-numbered year, shall hold office for an additional year and until their successors are qualified. No person shall hold the office of sheriff or county treasurer for more than two consecutive terms.

"SEC. 2. This proposition shall be submitted to the electors of this state at the general election of representatives in the year 1902 for their approval or rejection. The amendment hereby proposed shall be designated on the official ballot by the following title : 'The biennial-election amendment to the constitution,' and shall be voted for or against, as now provided by law under such title." (Laws 1901, ch. 424.)

13—69 KAN.

At the same session of the legislature an act was passed providing for biennial elections of county officers except county commissioners, which contained two sections as follows :

"Sec. 3. On or before the second Monday in January, 1902, the governor shall appoint a judge for each of the following judicial districts, to wit : The tenth, fourteenth, fifteenth, seventeenth, nineteenth, twentieth, twenty-first, thirtieth, thirty-first, thirty-second, thirty-third, thirty-fourth, and thirty-fifth, who shall hold their offices from the second Monday in January, 1902, until the second Monday in January, 1903. At the general election in 1902 a judge shall be elected in each of said judicial districts, who shall hold his office for a term of four years from the second Monday in January, 1903. And there shall be a judge elected in each of said judicial districts at the general election every four years thereafter. No election for judge of the district court shall be held in said districts in the year 1901.

"Sec. 4. On or before the second Monday in January, 1904, the governor shall appoint a judge for each of the following judicial districts, to wit : The sixth, seventh, eighth, ninth, eighteenth, twenty-ninth, and thirty-sixth, and of the court of common pleas of Wyandotte county, who shall hold their offices from the second Monday in January, 1904, until the second Monday in January, 1905. At the general election in 1904, a judge shall be elected in each of said judicial districts and in said Wyandotte county, who shall hold his office for a term of four years from the second Monday in January, 1905. And there shall be a judge elected in each of said judicial districts at the general election every four years thereafter. No election for judge of the district court shall be held in said districts in the year 1903." (Laws 1901, ch. 176.)

The resolution quoted was proposed in the senate on January 16, 1901. It was finally adopted by both houses on February 12 following. On January 31 the house referred the resolution to its judiciary

committee, and on the same day the biennial-election bill was introduced in that chamber.   The bill finally passed both houses February 28.   The resolution and the bill each provided that it should take effect upon publication in the statute-book, which occurred May 1, 1901.

By decisions of this court rendered in July, 1901, and February, 1902, the statute was held to be valid. (*Wilson v. Clark*, 63 Kan. 505, 65 Pac. 705 ; *The State v. Andrews*, 64 id. 474, 67 Pac. 870.)   No election of judges of the district court was held in 1901, and appointments made by the governor under the statute were upheld.   At the election of November, 1902, the proposed amendment to the constitution was adopted. No election to the office of district judge in the district concerned was held in the year 1903.   Prior to the second Monday in January, 1904, and claiming to act under the biennial-election law quoted above, the governor appointed the defendant to the office in question.   The defendant duly qualified, and on January 12, 1904, entered upon the performance of his duties as judge of the district court of the twenty-ninth judicial district.

May this court oust the defendant and restore the plaintiff to the office which both parties claim?   The question involved is purely one of interpretation. The generally-recognized rules for enabling truth to come to utterance in such matters are old and well understood, and need not be restated here.   The latest exhibition of them may be found in the eighth volume of the Cyclopedia of Law and Procedure, commencing at page 724, together with abundant references to authorities illustrating their application.   A similar service has been performed in volume 6 of the second edition of the American and English Encyclodedia of

Law, at page 920 *et seq*. Pertinent cases are digested in volume 10 of the Century edition of the American Digest, at page 1222 *et seq*. Blackstone's rules for the interpretation of laws and the construction of statutes (Commentaries, 59 and 87) are models of terse and luminous statement, and are sufficient for a correct determination of this controversy. The treatment of the subject by Hugo Grotius in the chapter "De In-terpretatione" of his work, "De Jure Belli et Pacis" (Lib. II, Cap. XVI), has never been superseded; and some of the most exalted portions of our modern doc-trine Grotius translates from Aristotle. There is, therefore, no lack of qualified guides.

The plaintiff plants himself in the position that the words of the constitutional amendment, "all officers whose successors would, under the law as it existed at the time of their election, be elected in an odd-numbered year, shall hold office for an additional year, and until their successors are qualified," are the measure of his rights. He says :

"We have nothing to consider except the import of those words according to their ordinary and known meaning as used in common parlance. . . . No question of law or construction can arise under this language, and to determine whether the plaintiff or any officer 'shall hold office for an additional year,' we have only to inquire, What was the law existing at the *time of his election?* And if we find that under it his successor would be elected in an odd-numbered year, then the whole question is solved, and such officer holds for an additional year."

He insists that the change from annual to biennial elections disturbed the official term of judges of the district court as well as of county and township officers, and that the words of the amendment must be given a signification as large as the necessity for their use.

When measuring by their context he relates the words quoted to the first sentence of the amendment, fixing the elections, instead of to the second, referring to certain officers, and allows no possibility of sequence or dependence between the words upon which he stakes his case and those in juxtaposition with them ; and he asserts that the framers of the amendment would have injected some characterizing word, as, for example, the word "such," between the words "all" and "officers" if it had been intended to make a reference to the officers designated in the second sentence.  When confronted with the statute the plaintiff contends that the legislature adopted the resolution before there was any statute, and hence must have had judges of the district court in mind and must have provided for them by the amendment.   He says :

"It is manifest that the statute was not enacted with any reference to the proposed amendment and its provisions, and that the amendment was proposed and adopted without reference to any statute whatever."

He claims the statute was temporary and covered only a part of the field, while the amendment was permanent and covered it all ; and that the amendment repealed the statute because inconsistent with it, and because the amendment was the later law, derived from the highest possible authority in the state.

At the threshold of any discussion of these claims appears the case of *Griffith v. Manning*, 67 Kan. 559, 73 Pac. 75, decided by this court July 10, 1903.   The syllabus of that case reads :

"The amendment to the constitution regulating elections, adopted in 1902, refers only to the election of county and township officers, and the term 'all officers,' therein used, means all county and township officers.

Fischer v. Moore.

"The office of judge of the city court of Kansas City is neither a county nor a township office, and hence the term of the incumbent thereof is not extended by virtue of said amendment."

The action in that case was one of *quo warranto*. It was brought against a person who held possession of an office because he claimed to be an officer whose successor would, under the law as it existed at the time of his election, be elected in an odd-numbered year; therefore, under the express terms of the constitutional amendment, he claimed the right to hold for an additional year and until his successor should qualify. The court heard oral argument, considered the briefs, and after careful consideration arrived at a conclusion embodying the unanimous opinion of all the justices. It was held that the office claimed was not a county or a township office. But that did not determine the case. The incumbent was an officer, and an officer who fell within the exact description of the third sentence of the constitutional amendment, if the language there used were to be given the force now contended for. The position of the defendant was identical with that of the plaintiff in this case. If the expression "all officers" were to be given a literal interpretation the defendant was entitled to hold. It was absolutely necessary, therefore, to determine whether or not the words "all officers" should be given an unlimited and unrestricted signification; and if the language of the amendment were held to apply to some officers only and not to all officers, it was then necessary to determine further if the defendant was included. The scope of the amendment was of the essence of the controversy, and the conclusion of the court was expressed in positive terms as to what it did include, rather than in negative terms

as to what it did not include. Although the governor of the state could act upon the authority of the statute alone, he doubtless made the appointment assailed in this action in full reliance upon the finality of the interpretation which the constitutional amendment received in the case of *Griffith v. Manning*, and that decision ought not to be overturned upon anything short of the most positive conviction of error.

Because, however, the office involved is one of great importance to the people of the district and of profit and honor to its incumbent, and because it was not specifically mentioned in the opinion in the case of *Griffith v. Manning*, the court has examined the question anew, thankful for the able and critical arguments of the counsel for the respective parties both in the briefs and at the bar.

In support of his cause, the plaintiff cites the opinion of Johnson, J., in the case of *Newell against The People*, 7 N. Y. 9, 97, as follows :

"Whether we are considering an agreement between parties, a statute, or a constitution, with a view to its interpretation, the thing we are to seek is *the thought which it expresses*. To ascertain this, the first resort in all cases is to the natural signification of the words employed, in the order and grammatical arrangement in which the framers of the instrument have placed them. If thus regarded, the words embody a definite meaning which involves no absurdity and no contradiction between different parts of the same writing, then that meaning apparent upon the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed. In such a case there is no room for construction. That which the words declare is the meaning of the instrument ; and neither courts nor legislatures have the right to add to or to take away from that meaning. This is true of every instrument, but when we are speaking of the most solemn and deliberate of all human writings,

those which ordain the fundamental law of states, the rule rises to a very high degree of significance. It must be very plain, nay, absolutely certain, that the people did not intend what the language they have employed, in its natural signification, imports, before a court will feel itself at liberty to depart from the plain reading of a constitutional provision."

This language is but an amplification of that of Vattel, in his Law of Nations (Bk. 2, ch. 17, § 263), which was substantially adopted by this court in *Fitzpatrick v. Gebhart*, 7 Kan. 35, 47, and it undoubtedly expresses the true rule of the law. The plaintiff, however, does not bring himself within its terms. He insists that the case be decided not upon the words of the instrument but upon the words of a single sentence of the instrument; not upon the words in the order and grammatical arrangement in which the framers placed them but upon such words in a different order and arrangement; and he would ignore the absurdity involved in making the words extend to ward councilmen and school-district officers.

It is a truism that a fragment of a writing torn from the body of an instrument is no criterion of its meaning. Words always take the tang and dye of their fellows, and depend for their effect upon their collocation. When wrested from their setting and association, they lose their quality of enlightenment and their informing power. The stark literalness of the interpretation contended for would have hanged the surgeon who opened the vein of a man who fell down in the streets with a fit, under the enactment that whoever drew blood in the streets should be punished with the utmost severity (Black. Com. 61); and would have approved the suggestion of Pericles that an obligation of persons to lay down their steel might be satisfied by laying down steel buckles when

swords were meant. (Grotius, *supra*.) Therefore, the court cannot be confined to the words the plaintiff quotes, and the fact that it is a constitutional provision which is to be construed makes no difference.

The case of *Pape v. Capitol Bank*, 20 Kan. 440, 27 Am. Rep. 183, is directly in point. Section 8 of article 13 of the constitution reads:

"No banking law shall be in force until the same shall have been submitted to a vote of the electors of the state at some general election, and approved by a majority of all the votes cast at such election."

No banking law has ever been submitted to a vote of the people of this state. An examination of the context shows, however, that the words "no banking law" referred merely to a single kind of banking law, and in so deciding this court said:

"Unquestionably there are three kinds of banks lefined by Bouvier—banks of deposit, banks of discount, and banks of circulation; and the language of the first section of said article 13 is general: 'No bank shall be established otherwise than under a general banking law.' So that, under a technical construction of sections one and eight, and ignoring the other sections, the establishment of any bank, of any kind, and for any purpose, would be forbidden. And as the article does not name incorporated, as distinguished from unincorporated banks, and as constitutional provisions have respect to the substance, and not merely to the form, or name, the carrying on of any banking business by any corporation, institution, or person, whether issuing currency, receiving deposits, or discounting commercial paper, would fall within the prohibitions of this article. Clearly no such check upon the commercial interests of the state was intended. 'Banks and Currency,' is the title; and *currency banks* are those and those only intended by the article. All banks, that is, all banks within the scope of the article, are required to keep offices and officers for the issue and redemption of their circulation. But a bank

of deposit purely, has no circulation. It is not a bank, therefore, within the scope of the article."

Since it is permissible for the court to seek further light, a single fact will show that avail must be made of every possible aid. There are two laws providing how the office in dispute shall be filled, if plaintiff's theory of the constitutional amendment prevail. The legislature framed the amendment, and it framed the statute. The suggestion of a conflict is the suggestion of a doubt as to the literal meaning of words. The adoption of a constitutional amendment will not repeal a valid statute unless the repugnance between them be irreconcilable. (*Leavenworth Co. v. The State,* 5 Kan. 688, 693; *Prohibitory Amendment Cases,* 24 id. 700, 722.) And in determining the question of repeal the court must be guided by the same considerations that control in other cases. (*Prouty v. Stover, Lieut. Governor,* 11 Kan. 235.)

The title of the resolution describes a single subject, and that is biennial elections. The ballot to be voted by the people designates the subject of the amendment as "The biennial-election amendment to the constitution," and it purports to amend a section of the constitution which provides for annual elections. The regulation of terms of office is not named in either of the descriptions by which the amendment might be known; therefore, the establishing of biennial, instead of annual, elections appears from the face of the instrument to be its purpose. Certain sections of the constitution relating to terms of office, however, were amended. Upon examination, these terms are found to relate to county and township offices only, to require annual elections to fill them, and to be the only terms of office standing in the way of biennial elections. The regulation of terms of office must be re-

garded, therefore, as a mere incident of the main scheme, and their adjustment as purely subordinate and subsidiary to the primary and substantial matter of biennial elections. The terms of office to be affected are specifically named, and no names but those of county and township officers occur. In treating of the incidental matter of terms of office the expression "all officers" is used. To avoid a glaring absurdity, it is necessary to assign a particular, instead of a general, meaning to the words. Their antecedents should be sought among the provisions of the document devoted to matters of their rank. Immediately preceding them, in logical and grammatical arrangement, classes of officers are specifically named to whom they very plainly apply. The law of parsimony forbids the assumption of anything more than is necessary to account fully for the expression. County and township officers satisfy every requirement in this respect, harmonize ambiguous words with every part of the instrument, and prevent an unwarranted broadening of the obvious scope of the amendment. To relate the words "all officers" to the first sentence of the amendment confuses the entire subject. Other descriptive words would be superfluous. Nowhere in the sections amended is any specific reference made to judges of the district court; nowhere in the new sections is any specific reference made to them. The purpose of the act is fully subserved without interpolating them, and the conclusion announced in *Griffith v. Manning* must follow.

If construed in the manner described the amendment is in perfect harmony with the statute. The claim of the plaintiff that the amendment and the statute are random acts perpetrated with the utmost

indifference to each other, but conveniently clashing in time to extend his term, cannot be conceded.

The statute provides in the most positive way for the appointment of judges after the time when the proposed amendment would take effect, if adopted. This method of filling the exceptional term is directly opposed to the one proposed by the amendment, if the amendment refer to such officers. The resolution and the statute must be regarded as contemporaneous acts of the same body, and so be construed together, or the statute must be regarded as an interpretation of the scope of the resolution by the legislature which framed and proposed it. In either event they were both designed to stand.

At the time of the adoption of the two measures the legislature was engaged in the inauguration of a policy of holding elections every two years. That body was wholly competent to bring about the desired change so far as judges of the district court were concerned, and so far as other offices were concerned, except those mentioned in sections 3 and 4 of article 9 of the constitution. To remove these obstacles the amendment was proposed. It cannot be presumed that the legislature set in motion the unusual proceeding of a constitutional change to accomplish that which it was able to do by statute, and the fact that it did pass a statute covering the matter within its power conclusively shows that the amendment was understood to relate to other things.

Looking at the amendment itself, it is very plain no permanent policy regarding the terms of judges of the district court was in contemplation, since the legislature is still left free to readjust the commencement of such terms and to provide for the interregnum arising from such readjustment. The legislature framed the

amendment and not the people themselves in a constituent assembly. The legislature was responsible for the meaning of its proposition to the people. Before the resolution was published the legislature gave to it a definite meaning by a statute which excluded judges of the district court from its purview. With this meaning the resolution was presented to the people for their consideration. The statute was held to be constitutional by this court. It operated to prevent the election of judges in the year 1901. The governor acted upon it and filled the resulting vacancies by appointment, and at the moment when the voter deposited his ballot in the box at the election of 1902 it was undisputed law that no election of judges would take place in 1903, whether the amendment carried or not. Under the circumstances, to assume that the people regarded the amendment with some peculiar notion of their own different from that assigned to it by its proponent and expounder, and destructive of a valid companion law, seems chimerical, indeed.

The conclusion must be that the adoption of the amendment did not repeal the statute, and that the statute provides, through appointment by the governor, for filling the exceptional term occasioned by the elimination of the election of 1903.

The foregoing is sufficient to indicate broadly the views of the court. It would transcend all proper limits of a written opinion to answer in detail all the points made by the plaintiff. The court is of the opinion that he cannot prevail. The writ is denied, and judgment is rendered for the defendant for costs.

All the Justices concurring.